FOURTH DIVISION

No. 1-09-2348

| | | |
|---|---|---|
| *In Re*: | ) | Appeal from the |
| | ) | Circuit Court of |
| ALEXIS H., RAYMOND H., and LEVONTE | ) | Cook County |
| T., Minors, | ) | |
| | ) | Nos.  08 JA 0015, 08 JA |
| Respondents-Appellees | ) | 0016, 08 JA 0017 |
| | ) | |
| (The People of the State of Illinois, | ) | The Honorable |
| | ) | Nicholas Geanopoulos, |
| Petitioner-Appellee, | ) | Judge Presiding. |
| | ) | |
| v. | ) | |
| | ) | |
| Danielle T., | ) | |
| | ) | |
| Respondent-Appellant.) | ) | |

JUSTICE GALLAGHER delivered the opinion of the court:

Respondent-mother appeals the trial court's order adjudicating her three children wards

of the court.  On appeal, respondent-mother claims that the trial court abused its discretion in

admitting into evidence: prior outcries of sexual abuse; opinion testimony of witnesses that

bolstered the children's credibility; and her prior bad acts that portrayed her as a bad parent.

Respondent-mother also contends on appeal that the trial court's findings of abuse and neglect of

her three children and sexual abuse of two of her children were against the manifest weight of the evidence. For the reasons that follow, we affirm.

## I. Background

The State filed petitions for adjudication of wardship in January 2008 relating to L.T., A.H. and R.H., based on neglect due to the lack of care, exposure to an injurious environment and substantial risk of physical harm of all three children and sexual abuse of A.H. and R.H. L.T. was born on January 6, 1997, A.H. was born on December 11, 1997, and R.H. was born on June 9, 1999. The children were placed in protective custody on January 9, 2008, and temporary custody was granted on January 11, 2008. The petition for adjudication was prompted by a hotline call placed to the Department of Children and Family Services (DCFS) in December 2007, alleging that the children were left with their paternal aunt without an adequate care plan and that the family was homeless.

The adjudication hearing was held on July 7, 2009. Amy Smith testified at the adjudicatory hearing on the State's behalf. Smith is employed by LaRabida Children's Hospital as an integrative assessment screener. Smith interviewed the children on March 7, 2008, and prepared an integrative assessment report. Smith stated that a prior DCFS report concerning the family existed, which included sexual penetration of A.H. and L.T. by Rakeem Williams in 2005. Rakeem was a friend of children's mother.

On March 7, 2008, Smith along with Alison Fry, employed by Lifelink, interviewed L.T., who was 11 years old at that time. L.T. indicated that the family lacked a consistent place to live and provided approximately four or five addresses where they had lived. L.T. did not make an outcry of sexual abuse.

Also on March 7, 2008, Smith and Fry interviewed R.H., who was eight years old at that time. R.H. made an outcry of sexual abuse early in the interview, which according to Smith indicated that the sexual abuse was a primary concern of his. R.H. stated that in 2005, Rakeem forced him to perform oral sex on two occasions and that "Ricky made him suck on his private part." R.H. also stated that Rakeem forced oral sex on L.T. in 2007. R.H. further stated that Shorty sexually abused him in 2007. R.H. also indicated that "Shorty had done something nasty to his sister and made her underwear bleed." According to R.H., his parents were aware of the incidents with Rakeem, but he was unclear about whether they knew about the incidents with Shorty.

Smith then testified regarding her interview with A.H. in which Fry was also present. When Smith interviewed A.H., she was 10 years old. A.H. made outcries of sexual abuse during the interview identifying Rakeem and Shorty as the perpetrators. A.H. stated that she was sexually abused twice by Rakeem in 2005. In 2008, A.H. made an outcry of sexual abuse that occurred when she was eight years old against Shorty and stated that he put his "thing" in her "butt." A.H. stated that Shorty sexually abused her twice. A.H. indicated that her parents knew what happened to her, but they did not believe her. A.H. revealed that R.H., too, had been sexually abused. A.H. stated that "Shorty made her little brother, referring to R.H., suck his thing." Smith stated that A.H. demonstrated inappropriate demeanor when she discussed the sexual abuse because she was laughing and covering her mouth indicating that she had anxiety about the subject matter being discussed. Smith testified that A.H.'s statements throughout the interview were consistent with her other statements and that A.H.'s statements were consistent with what her brothers reported to her.

Smith then testified about the children's statements concerning domestic violence between the children's mother and father. A.H. stated that her father hit her mother with a pole and once gave her mother a black eye. R.H. also reported domestic violence and stated that his father hit his mother with a sledgehammer and held a silver gun to her. L.T. also stated that physical abuse between his mother and father occurred and described an incident where his father hit his mother with a tire iron, injuring her arm.

Smith also talked to the children regarding drug and alcohol abuse. Smith stated that A.H. and R.H. told her that their father used crack cocaine and marijuana. L.T. stated that he saw his father sniffing powder. Smith next asked the children regarding alcohol abuse. A.H. stated that her mother drank large amounts of beer and would become angry and erratic. A.H. stated that her mother drank almost a whole store of beer and A.H. was able to reference beer brands, including Eight Ball. L.T. stated that his mother drank beer and referenced the Old E brand. R.H. also stated that their mother drank beer and referenced the Steel Reserve and Blue Top beer brand.

Smith asked the children about corporal punishment. A.H. stated that the children were hit with extension cords and the plastic lever used to open blinds. L.T. stated that his parents inflicted physical abuse on him and that corporal punishment was the primary mode of punishment.

Cynthia Pettis testified on behalf of the State. Pettis is an investigator for DCFS. In December 2007, Pettis spoke with R.H., who was eight years old. R.H. stated that he was not in school since September 2007, and he had been living in the family van. On the same day, Pettis also spoke with A.H., who was 10 years old. A.H. stated that she had not been in school since October 2007. A.H. stated that she had been living with different friends of her mother from

4

time to time, and she did not like living in all of those different places. A.H. revealed that she was inappropriately touched, but she did not give specific information. When Pettis spoke with A.H., she was real quiet and real sad. Pettis also spoke with L.T. on the same day, who was 10 years old. L.T. stated that he was not in school since October 2007. L.T. also stated that he had been living with several friends of his mother and did not feel safe living in their homes.

Lonnie Clemmons testified on behalf of the State. Clemmons is an investigator for DCFS. Clemmons was assigned to the children's case on December 17, 2008, when a call came into the hotline claiming inadequate shelter and inadequate parental supervision. On December 18, 2008, he interviewed A.H., who was 10 years old. A.H. stated that she and her family were living place to place at some of her parents' friend's houses. A.H. also stated that she did not like the living arrangement and was saddened by it. Clemmons next asked A.H. about sexual abuse. A.H. responded that at one of the places that they stayed at, she was "touched inappropriately" and indicated that Rakeem sexually abused her. A.H. did not provide a time frame when the sexual abuse occurred. A.H. indicated that she had not attended school since September of that year. A.H. saw or knew of her father using drugs, but not her mother.

Clemmons also interviewed L.T., who was 10 years old, on December 18, 2008. L.T. indicated that they lived with his parents' friends and they had also lived in a van. L.T. stated that he had not attended school since September of that year. L.T. saw his father use drugs, but not his mother.

Clemmons interviewed R.H., who was eight years old, on December 18, 2008. He too stated that they had lived in various homes and in vehicles. R.H. stated that he had not attended school since September 2008. When R.H. stayed at his parents' friends homes, he had been

whipped by people in those homes on one or two occasions. R.H. saw his father use drugs, but not his mother. R.H. made an outcry of sexual abuse, but did not identify his perpetrator.

On January 8, 2009, Clemmons spoke with respondent-mother. She indicated that she and the children's father were trying to get themselves together. Respondent-mother stated that the children were not in school because they moved out of the school district and she was trying to get them into another school.

The State called Sharon Wolford, who is a former child protection investigator with DCFS, to testify. Wolford spoke with the children's father, R.H., Sr., on December 20, 2007, with respondent-mother also present. R.H., Sr., stated that following his release from incarceration, he and respondent-mother were unstable so they took the children to stay at his sister's home. During the interview, Wolford smelled alcohol on the father and informed him that he had a strong scent of alcohol on his body. In response, the father stated that yes he had been drinking, that he missed his children and that he did not have a drinking problem. Respondent-mother denied not having a domicile and stated that she and the children were staying with her friend Nicole Brown.

Carmen McGhee testified on behalf of the State. McGhee is an investigator with DCFS. McGhee spoke with respondent-mother on June 16, 2008, and informed her that she was responsible for investigating allegations of sexual abuse to the children. Respondent-mother stated that her children did not tell her about the allegations, but she knew that the children discussed the allegations with an aunt, who had subsequently died. Respondent-mother knew the alleged perpetrator, Rakeem, was not allowed to be around the children and she did not allow the children to be around him. McGhee recommended that respondent-mother and Shorty be indicated for risk of sexual harm and penetration, respectively. Indicated was recommended

because the children's statements regarding the sexual abuse issues were consistent and collateral to one another. During cross-examination, McGhee stated that respondent-mother did not believe that the allegations were true because she was normally with her children a lot and she did not see how it happened.

During the adjudication hearing, Alison Fry testified on the State's behalf. Fry is employed by Lifelink as a case worker. Fry began conducting home visits of the family in October 2008. On January 5, 2009, she conducted a home visit at respondent-mother's home and attended L.T.'s birthday party held there. Rakeem was present at the birthday party. Fry learned that Rakeem was present after the visit when she spoke with the children on the way back to the foster home to drop the children off. A.H. stated that Rakeem was present, and R.H. told her to be quiet and not to say anything. Rakeem did not speak to the children at the birthday party, but may have said a few words to respondent-mother. Rakeem stood in the kitchen for about 10 minutes, and then went into the family room where everyone else was located. Fry spoke with respondent-mother the next week and told her that Rakeem's presence at the party was inappropriate due to the children's allegations against him. Fry also stated that Rakeem's presence around the children created a risk of harm to the children. Respondent-mother responded that she never invited Rakeem or told him the address of the home. Respondent-mother stated that she invited Rakeem's sister and Rakeem came along with her. Respondent-mother told Rakeem's sister that Rakeem should not return to the house.

Carrie Stelnicki testified on the State's behalf. The Chicago Children's Advocacy Center employed Stelnicki as a forensic interviewer. R.H. told Stelnicki that a grown man named Shorty did something nasty or bad to him on June 9, his birthday, when they stayed with him and his sister. R.H. stated that he was in bed with Shorty in the basement of the house where Shorty

lived along with his brother and sister. Shorty told the children to come here and pulled them toward him. R.H. then stated that Shorty put his "pee-pee" in his mouth. R.H. described a "pee-pee" as a penis. R.H. also spoke about an incident when he was seven involving Shorty. R.H. stated that Shorty put his "pee-pee" in his "butt." Specifically, R.H. stated that he was on his stomach on the bed with his clothes pulled down and Shorty was on top of him. R.H. indicated that A.H. and L.T. saw what happened and told their parents. R.H. stated that his father and Shorty got into a fight after his father learned of the information. R.H. also stated that when he was eight years old he saw Shorty put his "pee-pee" in his sister's "butt" on two different occasions. R.H. described seeing his sister on her stomach with her clothes off or down and that she was crying. R.H. also reported another incident. R.H. recalled when he was eight years old he saw Rakeem put his "pee-pee" in A.H.'s "disgusting"; then he pointed to his crotch when asked to describe what he meant by "disgusting." R.H. stated that Rakeem threw A.H.'s underwear on the roof. R.H. indicated that one of the children told his father, who then gave Rakeem a whipping. R.H. also stated that his mother saw Shorty put his "pee-pee" in his mouth and she stopped the act. R.H.'s mother called the police after witnessing the incident.

When Stelnicki talked with A.H., she described several incidents that occurred with Rakeem when she was seven years old. A.H. also talked about an incident with Shorty when she was nine years old while she lived at Shorty's sister's house. A.H. stated that Shorty put his "pee-pee" in her "butt." A.H. next described that on the same night, Shorty put his "pee-pee" in R.H.'s mouth and said R.H. threw up. A.H. also described an incident that occurred when she was seven years old with Rakeem, who put his "pee-pee" in her "butt" and his "pee-pee" in her "privacy." A.H. stated that Rakeem first put his "pee-pee" in her "butt" and then put his "pee-pee" in L.T.'s mouth. After that, Rakeem put his "pee-pee" in her privacy, which caused her to

8

have a period. Stelnicki stated that both A.H. and R.H. spoke about their parents learning of the incident that night. A.H. stated that her parents were home and were playing cards while drinking. Stelnicki also stated that A.H. indicated that her mother did not believe her.

Detective Mark DiMeo testified on behalf of respondent-mother. DiMeo is a detective with the special investigations unit of the Chicago police department assigned at the Chicago Children's Advocacy Center. He attended interviews of the children regarding alleged sexual abuse conducted by the forensic interviewer. L.T. stated that Rakeem fondled him over his clothing and the other children were in the same room when this happened. L.T. also stated that Rakeem put his private part in A.H.'s private part and threw her underwear out of the window. DiMeo also witnessed an interview of A.H. in approximately June 2005. A.H. alleged that Rakeem placed his penis into her "butt" and into her private part when she was seven years old. DiMeo conducted an investigation of the alleged incidents occurring in 2005, which was then suspended until it was reopened in June 2008.

DiMeo also witnessed interviews of A.H. and R.H. occurring in June 2008, when the suspended investigation was reopened. DiMeo suspended the investigation because he did not think probable cause could be established since some conflicting statements were made during the interviews. DiMeo also suspended the investigation because he could not locate and identify either of the two alleged offenders. On cross-examination, DiMeo clarified that the probable cause he referred to was the probable cause standard applicable in a criminal case, which differed from the standard used in civil cases. DiMeo did not review the case to determine whether sexual abuse allegations could be proven in a child protection court. DiMeo also stated that respondent-mother told him that the children lied about the sexual abuse allegations, and she did not want to proceed with investigation of the allegations. DiMeo asked respondent-mother

to bring the children in so he could interview them to determine if they were recanting. Respondent-mother failed to do so. DiMeo lost track of respondent-mother and the children, resulting in a suspension of the investigation. DiMeo was unaware of the medical records referring to A.H.'s open hymen.

After the adjudication hearing, the trial court found that all three children had been neglected and abused and that A.H. and R.H. were sexually abused.

On August 24, 2009, the trial court held the dispositional hearing. At the conclusion of the disposition hearing, the trial court declared the three children wards of the court and appointed a guardian. Respondent-mother timely appealed. Respondent-mother appealed the trial court's findings at the adjudicatory hearing only. Both the State and public guardian each filed a brief on appeal, which were considered by this court.

## II. Standard of Review

During an adjudicatory hearing, the rules of evidence used in civil proceedings apply to the hearing. *In re A.W.*, 231 Ill. 2d 241, 256, 897 N.E.2d 733, 741 (2008), quoting 705 ILCS 405/2-18(1) (West 2004). As such, it is within a trial court's discretion to admit evidence, and the trial court's ruling regarding admission of evidence will not be reversed absent an abuse of its discretion. *In re A.W.*, 231 Ill. 2d at 254, 897 N.E.2d at 740. An abuse of discretion " 'occurs when the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court.' " *Blum v. Koster*, 235 Ill. 2d 21, 36, 919 N.E.2d 333, 342 (2009), quoting *People v. Hall*, 195 Ill. 2d 1, 20, 743 N.E.2d 126, 138 (2000).

A trial court's finding of abuse and neglect is reviewed adopting a manifest weight of the evidence standard. *In re M.W.*, 386 Ill. App. 3d 186, 196, 897 N.E.2d 409, 417 (2008). A trial court's finding is against the manifest weight of the evidence only if the opposite result is clearly

evident. *In re A.W.*, 231 Ill. 2d at 254, 897 N.E.2d at 740. Although the term "injurious environment" "is a broad and amorphous concept that cannot be defined specifically, \*\*\* it includes the breach of a parent's duty to ensure a safe and nurturing shelter for the children." *In re A.W.*, 231 Ill. 2d at 254, 897 N.E.2d at 741. A decision finding an adjudication of neglect is reviewed based on the totality of the evidence and on the basis of its unique circumstances. *In re A.W.*, 231 Ill. 2d at 254, 261, 897 N.E.2d at 741, 745.

Respondent-mother requests this court to adopt a mixed standard of review regarding the trial court's findings. Respondent-mother, however, first presents this contention in her reply brief. Pursuant to Supreme Court Rule 341(j), new arguments raised by an appellant in a reply brief should be ignored by this court. *CCP Ltd. Partnership v. First Source Financial, Inc.*, 368 Ill. App. 3d 476, 485, 856 N.E.2d 492, 499 (2006); 210 Ill. 2d R. 341(j). As such, we will not address respondent-mother's request to impose a mixed standard of review. Instead, we will follow the established precedent that findings of abuse and neglect of children are reviewed adopting a manifest weight of the evidence standard.

### III. Juvenile Court Act of 1987

The Juvenile Court Act of 1987 (Act) (705 ILCS 405/1-1 *et seq.* (West 2008)) is at issue in the instant appeal. The Act provides the procedures that must be followed to determine whether a minor should be removed from his parents' custody and become a ward of the court. *In re A.W.*, 231 Ill. 2d at 254, 897 N.E.2d at 740. According to the Act, a trial court must employ a two-step process to decide whether a minor should become a ward of the court. *In re Jay H.*, 395 Ill. App. 3d 1063, 1068, 918 N.E.2d 284, 288 (2009). Step one is the adjudicatory hearing on the petition for adjudication of wardship requiring the trial court to determine whether a minor is abused, neglected or dependent. *In re Jay H.*, 395 Ill. App. 3d at 1068, 918

11

1-09-2348

N.E.2d at 288, quoting 705 ILCS 405/2-18(1) (West 2008). If a trial court finds that a minor is abused, neglected or dependent, the trial court then moves to step two, which is the dispositional hearing. *In re Jay H.*, 395 Ill. App. 3d at 1068, 918 N.E.2d at 288. At the dispositional hearing, the trial court determines whether it is consistent with the health, safety and best interests of the minor and public that the minor should be made a ward of the court. 705 ILCS 405/2-21(2) (West 2008). Under the Act, a neglected minor includes "any minor under 18 years of age whose environment is injurious to his or her welfare." 705 ILCS 405/2-3(1)(b) (West 2008). With this statutory frame work in mind, we will now address respondent-mother's contentions on appeal.

## IV. Analysis

### A. Admitting Evidence Regarding Previous Outcries

Respondent-mother first contends on appeal that the trial court abused its discretion by admitting evidence about Rakeem's prior sexual abuse reports to bolster the credibility of the children's hearsay statements. Respondent-mother claims that the children's outcries against Rakeem were immaterial to establish the credibility of the children's hearsay sexual abuse statements against Shorty occurring at a different time and location. Respondent-mother also claims that the trial court abused its discretion by admitting highly prejudicial evidence relating to Rakeem and then relying upon that evidence to bolster the children's credibility to support the children's statements that Shorty resided with them, that Shorty abused them, or that they had been subjected to lack of care, an injurious environment or a risk of harm. Respondent-mother maintains that absent the unfairly and improperly admitted statements that bolstered the children's credibility, the trial court could have found that the children's uncorroborated hearsay statements were insufficient to support the allegations in the petition. Respondent-mother also

12

maintains that the evidence against Shorty was closely balanced because L.T. made no outcry, R.H. made an outcry in his sixth interview with social services and medical personnel, and A.H. made an outcry in her eighth interview. Due to the closely balanced evidence here in conjunction with admission of the highly prejudicial evidence about Rakeem's sexual abuse for the purpose of bolstering the children's credibility, respondent-mother maintains that the trial court's finding of abuse and neglect should be reversed.

The public guardian states that respondent-mother introduced evidence regarding the prior alleged sexual abuse acts committed by Rakeem, and by doing so, acquiesced to introduction of that evidence. The public guardian claims that respondent-mother offered Detective DiMeo's testimony about his observations of interviews with the children. The public guardian contends that because respondent-mother presented evidence in the trial court and argued that the children's 2005 statements about previous abuse by Rakeem should be considered in assessing the children's credibility surrounding the 2008 sexual abuse statements, she cannot claim error on appeal regarding admissibility of that evidence and prevail.

A trial court's decision to admit evidence is reviewed by this court for an abuse of discretion. *In re A.W.*, 231 Ill. 2d at 256, 897 N.E.2d at 741. In her reply, respondent-mother contends that Detective DiMeo's testimony regarding the alleged abuse by Rakeem was presented after the State called five witnesses who testified about prior hearsay statements the children made concerning Rakeem. Respondent-mother claims that the State changed its purpose for introducing the allegations against Rakeem during closing arguments when the State indicated that it would not be bringing charges against Rakeem, but then sought to introduce that evidence to bolster the children's credibility regarding the outcry of sexual abuse against Shorty.

Apart from the initial purpose for which the State introduced the evidence of sexual abuse allegations committed by Rakeem, respondent-mother introduced additional evidence by way of Detective DiMeo's testimony concerning the allegations. The trial court may use its discretion in deciding whether to admit evidence. The evidence introduced by the State and respondent-mother regarding Rakeem supported the trial court's finding that the children were at risk of harm. The record reveals that Rakeem was present at a birthday party for L.T. in respondent-mother's home where the children were also present subsequent to respondent-mother's knowledge of the sexual abuse incidents involving Rakeem and the children. Although respondent-mother did not invite Rakeem to the birthday party, respondent-mother also did not ask Rakeem to leave upon seeing him at the house for the party. Respondent-mother presented evidence regarding the allegations against Rakeem to attack the children's credibility. The trial court did not use the evidence offered by the State during the proceedings as substantive evidence to prove the sexual abuse by Shorty. In light of the evidence that was offered during the proceedings, the trial court did not err in considering evidence pertaining to Rakeem to determine whether the children were neglected or at risk for harm. Respondent-mother knew of the children's outcries of sexual abuse against Rakeem, but still allowed Rakeem to be near the children at a birthday party subsequent to learning of the sexual abuse allegations. The trial court did not err in considering this information to decide whether respondent-mother exposed the children to an injurious environment or a risk of harm. No abuse of discretion occurred in the trial court's admission of evidence relating to sexual abuse allegations against Rakeem because that evidence was not used to bolster the children's credibility or as substantive evidence against Shorty.

Also, respondent-mother's attempt to claim that the evidence against Shorty was closely balanced because the children did not immediately make outcries of sexual abuse is not persuasive. The children here were interviewed on multiple occasions and their hesitation to discuss the sexual abuse that occurred to an interviewer fails to render the evidence against Shorty closely balanced. Additionally, the outcries of sexual abuse by Shorty were consistent because testimony presented during the hearing established that A.H. and R.H. made an outcry of abuse in their interviews with both Smith and Stelnicki. The children's outcries of sexual abuse were also corroborated because each child's statements of abuse to himself or herself and abuse to the other sibling corroborated the statements of each of the other children. Moreover, the trial court did not find L.T. to be sexually abused, and, as such, respondent-mother's position that the evidence is closely balanced because L.T. made no outcry of sexual abuse against Shorty is rejected. Here, the evidence of sexual abuse against Shorty was not closely balanced.

### B. Opinion Testimony

Next, respondent-mother claims that the trial court abused its discretion by admitting and relying upon the improper opinion testimony of Smith and Stelnicki since they were not disclosed as experts and the children's credibility was not a proper topic for expert testimony. Respondent-mother objects to the use of Smith's testimony that R.H.'s hearsay account of sexual abuse was credible due to the timing of his outcry early in an interview, the detail of his description of the act and purported consistency between his account, his siblings' statements and DCFS information. Respondent-mother also objects to Smith's testimony that A.H. gave a detailed and consistent account of sexual abuse and that A.H.'s laughter during the interview resulted from anxiety. Respondent-mother similarly objects to Stelnicki's testimony in which she stated that the credibility of a child's claim of sexual abuse is not negated by the child's

15

failure to give a concrete time line regarding when the alleged incidents occurred. Respondent-mother claims that she was severely prejudiced by admission of the experts' opinion testimony, which unfairly bolstered the children's credibility. Respondent-mother claims that absent the improper credibility opinions offered by Smith and Stelnicki, the trial court could have found that the children's hearsay statements lacked adequate corroboration and that the evidence at the adjudicatory hearing did not support the allegations in the petitions.

The public guardian responds that the trial court did not abuse its discretion by admitting Smith and Stelnicki's testimony because they did not opine about the children's credibility. The public guardian instead claims that Smith and Stelnicki testified about the children's description of sexual abuse. Thus, the public guardian claims that no abuse of the trial court's discretion occurred.

To determine whether the trial court abused its discretion by admitting Smith and Stelnicki's testimony, we must consider the content of their testimony. During the adjudicatory hearing, Smith testified that R.H.'s statements from the investigations occurring in 2005 and 2007 were consistent with the prior indicated reports. Smith also testified that A.H. made outcries of abuse and identified the perpetrators as Rakeem and Shorty, but did not provide a time frame of when the abuse occurred. Smith stated that A.H. made outcries about an incident involving Rakeem occurring in 2005 and about incidents involving Shorty occurring in 2008. Smith further stated that when A.H. described the incidents she was laughing inappropriately and covering her mouth demonstrating anxiety about the subject matter being discussed. Smith continued that A.H.'s statements were consistent throughout the interview and were consistent with her brother's statements. Stelnicki testified that it is not common for children to provide

concrete dates and times of incidents especially when multiple incidents have occurred or multiple offenders because children have difficultly keeping track of things that happened.

After reviewing the testimony, we agree with the public guardian that Smith and Stelnicki did not testify regarding the children's credibility. Smith and Stelnicki provided testimony based on their experiences in their vocation, which entails interviewing children when allegations of abuse or neglect have been made, but did not testify as experts. The testimony offered by Smith and Stelnicki consisted of factual conclusions about whether the information provided by the children was consistent with prior reports and with each other, and what the children's behavior may have indicated based upon their experiences garnered from their vocation. Respondent-mother relies on *People v. Cox*, 197 Ill. App. 3d 1028, 557 N.E.2d 288 (1990), and *People v. Pertz*, 242 Ill. App. 3d 864, 900, 610 N.E.2d 1321, 1344 (1993), to support her position that the testimony here bolstered the children's credibility.

In *Cox*, the expert's testimony regarding the witness's credibility was deemed inadmissible because the expert's opinion " 'that people in stressful situations sometimes have trouble recalling details is well within the comprehension of the trier of fact.' " *Cox,* 197 Ill. App. 3d at 1035, 557 N.E.2d at 293-94, quoting *People v. Nix*, 133 Ill. App. 3d 1054, 1059, 479 N.E.2d 1147, 1151 (1985). The *Cox* court also stated that the testimony was not admissible because its content was well within the range of understanding and knowledge of the average person and, thus, was not a proper subject of expert testimony. *Cox,* 197 Ill. App. 3d at 1035, 557 N.E.2d at 294. In *Cox*, the proffered witness was an expert, which differs from the instant case where neither Smith nor Stelnicki was proffered as an expert. Respondent-mother's reliance on *Pertz* is also misplaced. In *Pertz*, the doctor's expert opinion regarding the defendant's honesty during interviews conducted by the doctor was held to be inadmissible

17

because the doctor's testimony would have lent his professional credibility to the defendant's statements, unfairly affecting the credibility of the case. *Pertz*, 242 Ill. App. 3d at 900, 610 N.E.2d at 1344-45. Thus, the expert witness in *Pertz* offered testimony regarding a defendant's honesty during the interviews. Unlike in *Pertz*, the witnesses here did not provide their opinion regarding the truthfulness of the children's statements. The trial court did not abuse its discretion by admitting Smith's and Stelnicki's testimony because that testimony did not opine on the children's credibility as alleged by respondent-mother nor were Smith and Stelnicki proffered as experts.

## C. Other Bad Acts

Turning to respondent-mother's third issue on appeal, she claims that the trial court abused its discretion by admitting evidence about her other bad acts to bolster the children's credibility and to demonstrate that she had the propensity to be a bad parent ignoring danger to her children. Respondent-mother claims that a caseworker's observation of the children at a birthday party where Rakeem was present was not presented to offer evidence corroborating the children's statements, but was used to demonstrate respondent-mother's propensity to be a bad parent who exposed her children to sex offenders. Respondent-mother contends that other bad acts cannot be used to bolster the credibility of the children's statements and may be admitted only if offered for another purpose. Respondent-mother claims that L.T. made no outcry of sexual abuse against Shorty, R.H. waited until his sixth interview with social service and medical personnel to make an outcry and A.H. waited until her eighth interview to make any allegations regarding abuse by Shorty. Respondent-mother maintains that if the trial court had not admitted the highly prejudicial evidence about other bad acts and relied upon that evidence to bolster the children's credibility and to portray her as a bad parent, the trial court could have found that the

18

children's hearsay statements were not adequately corroborated and that the evidence presented was insufficient to prove that Shorty sexually abused the children. Respondent-mother contends that she was severely prejudiced by the admission of improper evidence of other bad acts and the adjudicatory finding should be vacated.

The public guardian responds that prior incidents of negligence and failure to protect a child can be considered in child abuse and neglect cases. Thus, the public guardian contends that the trial court did not abuse its discretion in admitting the testimony concerning Rakeem's attendance at L.T.'s birthday party where the children were also present. The public guardian claims that such evidence corroborates the children's statements that Rakeem was around the children subsequent to making the sexual abuse allegations. The public guardian contends that the birthday incident does not corroborate any sexual abuse allegations brought against Shorty, but the incident demonstrates respondent-mother's neglect due to a lack of necessary care and exposure to an injurious environment. The public guardian maintains that if any error is found in the admission of the birthday incident, any error is harmless because the totality of the evidence supports a finding of abuse and neglect.

As previously stated, whether evidence is admissible is within the trial court's discretion, and this court will not reverse a trial court's ruling admitting evidence absent an abuse of that discretion. *In re A.W.*, 231 Ill. 2d at 256, 897 N.E.2d at 742. Respondent-mother claims error with the trial court's admission of evidence relating to Rakeem's presence at L.T.'s birthday party. The children made statements that the children were still permitted near Rakeem after respondent-mother learned of the sexual abuse allegations. Respondent-mother does not deny that Rakeem was present at the birthday party where the children were also present, nor did respondent-mother ask Rakeem to leave the birthday party or shelter the children from potential

harm by removing the children from Rakeem's presence. Thus, the children's statements that Rakeem was not forbidden from being near them was sufficiently corroborated.

Also, one basis on which the State sought adjudication of the children was their exposure to an injurious environment. "Injurious environment" is a broad and amorphous concept, but it is understood to include "the breach of a parent's duty to ensure a safe and nurturing shelter for the children." *In re A.W.*, 231 Ill. 2d at 254, 897 N.E.2d at 741. This court in *In re J.J.*, 327 Ill. App. 3d 70, 78, 761 N.E.2d 1249, 1256 (2001), stated in reference to the admissibility of evidence of a prior shaken-baby death and a child's gunshot injuries in a guardianship case against a respondent-mother that "evidence of the past incidents was relevant to show that she lacked the cognitive ability to anticipate dangerous situations or to protect her children." Here, in light of the State's petition alleging abuse and neglect of the children, the trial court did not abuse its discretion in admitting into evidence the details relating to Rakeem's presence at L.T.'s birthday party to prove the allegations in the petition that the children were exposed to an injurious environment and were at risk of physical harm.

### D. Trial Court's Finding of Abuse and Neglect

#### 1. Findings of Sexual Abuse

Respondent-mother's next contention on appeal is that the trial court's findings of sexual abuse were against the manifest weight of the evidence because the State failed in proving that the children resided with the alleged sexual perpetrator and the children's statements of sexual abuse were uncorroborated. Regarding residency with Shorty, respondent-mother claims that the children's statements that they were staying or living in the same household as Shorty were not equivalent to the children residing with Shorty necessary to establish sexual abuse under the Act.

1-09-2348

Respondent-mother contends that the State did not present evidence demonstrating that respondent-mother intended the children to live permanently in the same household with Shorty. Respondent-mother maintains that the trial court's finding of the family's "transiency" and "nomadic" living cannot be reconciled with an intent to permanently reside with Shorty. Therefore, respondent-mother claims that the evidence presented at the adjudicatory hearing was insufficient to establish that the alleged perpetrator Shorty resided with or belonged to the same household as the children.

According to the Act, an abused minor includes:

"any minor under 18 years of age whose parent or immediate family member, or any person responsible for the minor's welfare, or any person who is in the same family or household as the minor, or any individual residing in the same household as the minor, or a paramour of the minor's parent:

* * *

(iii) commits or allows to be committed any sex offense against such minor[.]" 705 ILCS 405/2-3(2)(iii) (West 2008).

Thus, under the Act, the alleged nonfamily member perpetrator must either be in the same household or reside in the same home as the child. Respondent-mother urges this court to conclude that a lack of an intent to permanently reside in the same home with Shorty is sufficient to reverse the trial court's finding that the children and Shorty were in or resided in the same household. The respondent-mother places emphasis on the portion of the statute that states "any individual residing in the same household as the minor." Preceding this clause, however, is a clause that states "any person who is in the same family or household as the minor." Thus, a

21

minor in the same household as a perpetrator who commits a sexual offense against the minor is also considered an abused minor. Respondent-mother repeatedly moved the children, creating a nomadic and transient lifestyle. Testimony exists in the record that the children lived with a family member of A.H. and R.H.'s father, in a van and in the home of respondent-mother's friend, Nicole Brown, who is Shorty's sister. The lack of an intent to permanently live at the Brown home does not preclude a finding that the children and the Browns stayed in the same household given the family's past history of a nomadic lifestyle.

The Act does not define the term "household." See 705 ILCS 405/1-3 (West 2008). Respondent-mother offered a definition of the term "household" as: " '[a]n organized family and whatever pertains to it as a whole; a domestic establishment' "; and " '[a] family considered as consisting of all those who share in the privileges and duties of a common dwelling.' " *Cincinnati Insurance Co. v. Argubright*, 151 Ill. App. 3d 324, 331, 502 N.E.2d 868, 873 (1986), quoting *Liberty National Bank of Chicago v. Zimmerman*, 333 Ill. App. 94, 102, 77 N.E.2d 49 (1947). The definition offered by respondent-mother relates to the term as it is used in an insurance coverage context. This court, however, considers the definition in the Illinois Domestic Violence Act of 1986 (750 ILCS 60/103(6) (West 2004)) of members of a household more applicable to the instant case. According to the Domestic Violence Act, the term "household members" is defined in part as:

> "spouses, former spouses, parents, children, stepchildren and other persons
>
> related by blood or by present or prior marriage, persons who share or formerly shared a
>
> common dwelling, persons who have or allegedly have a child in common, persons who
>
> share or allegedly share a blood relationship through a child, persons who have or have

had a dating or engagement relationship, persons with disabilities and their personal

assistants, and caregivers." 750 ILCS 60/103(6) (West 2004).

Although a definition of the term "household" is not included in the Act, the legislature

expressly included a provision setting forth the Act's purpose. According to the Act, its purpose

is to secure for each minor the care and guidance that will serve the safety and moral, emotional,

mental, and physical welfare of the minor and the best interests of the community. 705 ILCS

405/1-2 (West 2006). Here, respondent-mother and her three children at times lacked a

permanent residence and, therefore, stayed in different households for an indefinite time period.

The family had no other permanent home when they stayed in the Brown household. Shorty

resided in the Brown home and his bedroom was located in the dwelling's basement. During

their stay in the Brown home, two of the children claimed to have been sexually abused by

Shorty, another household member. Even though the children experienced a transient lifestyle,

protection of the children under the specific facts of this case is warranted and is consistent with

the Act's purpose and legislature's intent in enacting the Act. Here, the trial court's finding that

the children either resided with or were members of the household that they shared with Shorty

was not against the manifest weight of the evidence.

Respondent-mother also claims that the trial court improperly admitted and relied upon

numerous uncorroborated and inconsistent hearsay statements from the children, which were

made long after the alleged incidents of oral, anal and vaginal abuse occurred. Respondent-

mother claims that A.H. and R.H. made statements that Shorty anally abused them and that

Shorty vaginally abused A.H., but medical examinations did not produce evidence of anal or

vaginal trauma. Respondent-mother claims that L.T. made an outcry of sexual abuse in 2005,

but in at least four subsequent interviews, L.T. made no such outcry concerning himself or his

siblings, creating an inconsistency with his prior hearsay statement. Respondent-mother also claims that A.H.'s hearsay statements are inconsistent because medical records indicate that she said on May 27, 2005, that Rakeem vaginally and anally abused her, but subsequent medical records on August 2, 2006, and July 17, 2007, indicate that A.H. denied any physical or sexual abuse. Respondent-mother further states that A.H. told DCFS investigators on December 18, 2007, and December 22, 2007, that Rakeem abused her, but she made no sexual abuse allegations against Shorty. Also, medical records on January 10, 2008, show that A.H. denied any physical or sexual abuse. Respondent-mother claims that A.H. did not refer to any abuse to her siblings in her 2005 outcry or in the separate interviews conducted in December 2007, but only made an outcry in her eighth interview in March 2008. Regarding R.H.'s outcry, respondent-mother claims that R.H. made no allegations of sexual abuse in July 2007, but did make an outcry in December 18, 2007. Respondent-mother also claims that on January 10, 2008, R.H. made both an outcry of sexual abuse and denied ever being sexually abused. Respondent-mother further claims that neither L.T. nor A.H. reported observing an incident of anal and oral sex between Shorty and R.H. even though R.H. stated that his siblings were present. Respondent-mother contends that the sexual abuse outcries were not spontaneously volunteered and some of the outcries were made years after the alleged events.

Since the children did not testify during the adjudicatory hearing, their statements were not subject to cross-examination. The hearsay statements the children made regarding the sexual abuse are admissible into evidence to support a finding of sexual abuse if the statements are corroborated. *In re A.P.*, 179 Ill. 2d 184, 199, 688 N.E.2d 642, 650 (1997). Here, sufficient corroborating evidence exists regarding the sexual abuse allegations against Shorty committed

upon A.H. and R.H. to conclude that the trial court's finding of sexual abuse was not against the manifest weight of the evidence.

According to the Act, a child's statement regarding sexual abuse must be corroborated to find the child sexually abused. 705 ILCS 405/2-18(4)(c) (West 2004). Section 2-18(4)(c) of the Act states that "[p]revious statements made by the minor relating to any allegations of abuse or neglect shall be admissible in evidence. However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." 705 ILCS 405/2-18(4)(c) (West 2004). The Illinois Supreme Court in *In re A.P.*, 179 Ill. 2d 184, 196, 688 N.E.2d 642, 649 (1997), analyzed the plain language of this section concluding that "a minor's hearsay statement is sufficient to support a finding of abuse or neglect where the statement either is subject to cross-examination or is corroborated by other evidence." The Illinois Supreme Court stated that "[c]orroboration is particularly important given the fact that the minor who made the statement will not be subject to cross-examination." *In re A.P.*, 179 Ill. 2d at 197, 688 N.E.2d at 649. In defining the phrase "corroborating evidence," the Illinois Supreme Court stated that it is "evidence that makes it more probable that a minor was abused or neglected. The form of corroboration will vary depending on the facts of each case and can include physical or circumstantial evidence." *In re A.P.*, 179 Ill. 2d at 199, 688 N.E.2d at 650.

Turning first to the sexual abuse allegations, we agree with the trial court that the children's statements of sexual abuse corroborated each other's statements and those statements make it more probable that the children were abused. In addition to the analysis set forth in subsection A above, which is incorporated here by reference, the evidence that follows further supports a finding of sexual abuse committed by Shorty. R.H. stated that Shorty did something

nasty to his sister. A.H. stated that Shorty put his "thing" in her "butt", and that he made R.H. "suck his thing." During the children's interviews with Stelnicki, R.H. stated that he saw Shorty put his "pee-pee" in his sister's "butt" on two occasions. During Stelnicki's interview with A.H., she stated that Shorty put his "pee-pee" in her "butt", and Shorty put his "pee-pee" in R.H.'s mouth. According to a Children's Advocacy Center report dated June 3, 2008, A.H. reported that her period came a few times, which coincided with her allegations of sexual abuse. The investigator concluded that A.H.'s claim of getting her period after penetration was consistent with trauma causing bleeding. Although a medical examination of A.H. neither confirmed nor refuted sexual abuse, the evaluating doctor noted that genital trauma can heal quickly and completely, and puberty can mask changes. A.H.'s medical records in February 2008, when she was eight years old, demonstrated an open hymen, which the doctor considered abnormal. The children's statements were also corroborated when they described the physical acts of sexual abuse committed on the children in a detailed fashion that would be unexpected of children of their age, including Shorty placing his "pee-pee" in a child's "butt" and in describing oral sex. After considering the totality of the evidence and unique facts of this case, the trial court's finding of sexual abuse of A.H. and R.H. by Shorty was not against the manifest weight of the evidence.

## 2. Findings of Substantial Risk of Harm, an Injurious Environment and Lack of Necessary Care

Lastly, respondent-mother claims that the other allegations of abuse and neglect made by the children were uncorroborated and against the manifest weight of the evidence. Respondent-mother contends that the children made inconsistent statements about living in a van and living

at various houses and that the children did not state that she drank to intoxication. Respondent-mother claims that even though medical evidence demonstrates some signs of physical injury, the children's statements regarding corporal punishment were inconsistent concerning the alleged perpetrator, ranging from their father to family friends. Respondent-mother again claims that if matters that were highly prejudicial or that the State could not prove up had not been admitted, then a different result could have been reached. Respondent-mother claims that even though the family was struggling with poverty, the manifest weight of the evidence did not demonstrate that she knowingly breached her duty to keep the children safe nor does a parent have a duty to anticipate sexual or physical assault or a substantial risk of harm to a child. Respondent-mother responds that she moved the family away from Rakeem and called the police regarding the allegations made against Shorty after learning of the abuse. Respondent-mother also claims that the State did not present evidence that her anger or drinking occurred with the frequency, duration or quantity that would have exposed her children to emotional or physical injury. Similarly, respondent-mother claims that the State did not present proof that the individuals imposing corporal punishment on the children resided with the children or that the punishment inflicted by the children's father was for reasons other than discipline. Respondent-mother maintains that the evidence does not support a finding that she breached her duty of care or the children were exposed to an injurious environment.

The record supports the trial court's finding that respondent-mother exposed the children to an injurious environment and breached her duty of care. The record consists of corroborated testimony regarding physical abuse to the children and parental use of substances. Both L.T. and A.H. stated that their father hit their mother and that domestic violence occurred between the parents. R.H. and A.H. stated that their father used crack cocaine and marijuana. L.T. saw his

father sniffing powder. The children also corroborated each other regarding their mother's use of alcohol. All three children referenced various brands of beer that their mother drank. A.H. further testified that their mother would become angry and erratic when she drank. Regarding physical abuse of the children, L.T. and A.H. indicated that they were hit or physically abused. A.H. specified that the children were hit with extension cords and the plastic lever used to open blinds. Medical evidence corroborated the children's statements regarding physical abuse because multiple and extensive scar marks were found on the children's buttocks and thighs.

The children stated that they were not in school regularly, and they corroborated each other's statements. In December 2007, R.H. stated that he was not in school since September 2007, A.H. stated that she was not in school since October 2007, and L.T. stated that he was not in school since September 2007. The children's statements regarding a lack of a permanent home were also consistent. L.T. stated that the family did not have a consistent place to live and provided various addresses of where they stayed, which included addresses of friends of his mother. L.T. stated that he did not feel safe living in his mother's friends' houses. A.H. and R.H. also stated that the family lived with various friends of their mother. Both L.T. and R.H. stated that they lived in vehicles. With respect to exposing the children to an injurious environment, even assuming respondent-mother is correct in asserting that a parent does not bear the responsibility of anticipating a sexual assault against a child, a parent must still take all necessary steps to protect a child from a known perpetrator and to remove a child from a likely harmful environment. The evidence in the record establishes corroboration of the children's statements that A.H. and R.H. were sexually abused, that the children were absent from school for a prolonged period of time and that the children were physically abused. The children's allegation of physical abuse with objects was further corroborated with medical evidence. As

such, the trial court's finding that the children were neglected due to a lack of necessary care, neglected due to their exposure to an injurious environment and abused due to a substantial risk of harm was not against the manifest weight of the evidence.

## V. Conclusion

The trial court did not abuse its discretion in admitting into evidence the children's previous outcries of sexual abuse, opinion testimony regarding the children's outcries of sexual abuse, and evidence of respondent-mother's other bad acts. Based on the totality of the evidence presented in the record, the trial court's finding that A.H. and R.H. were sexually abused and that the children were neglected due to the lack of care, exposure to an injurious environment and substantial risk of physical harm was not against the manifest weight of the evidence.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

O'MARA FROSSARD, P.J., and NEVILLE, J., concur.

REPORTER OF DECISIONS - ILLINOIS APPELLATE COURT

(Front Sheet to be Attached to Each case)

---

IN RE: ALEXIS H., RAYMOND, H. and LEVONTE T.,

Minors-Respondents-Appellees,

(PEOPLE OF THE STATE OF ILLINOIS,

Petitioner-Appellee,

v.

DANIELLE T.,

Respondent-Appellant.)

---

No. 1-09-2348

Appellate Court of Illinois

First District, Fourth Division

May 13, 2010

---

JUSTICE GALLAGHER delivered the opinion of the court.

O'MARA FROSSARD, P.J., and NEVILLE, J., concur.

---

Appeal from the Circuit Court of Cook County.

The Honorable Nicholas Geanopoulos, Judge Presiding.

---

For APPELLANT, Cook County Public Defender, Chicago, IL (Abishi C. Cunningham, Jr., Eileen T. Pahl, of counsel)

For APPELLEES, Cook County State's Attorney, Chicago, IL (Anita Alvarez, James Fitzgerald, Nancy Kisicki, Jennifer Streeter, of counsel) and Cook County Public Guardian, Chicago, IL (Robert F. Harris, Kass A. Plain, Mary Brigid Hayes, of counsel)