2022 IL App (1st) 1211399-U

No. 1-21-1399

Second Division
April 12, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| *In re* Z.C. and Z.C., | ) | Appeal from the |
| | ) | Circuit Court of |
| | ) | Cook County. |
| Minors, | ) | |
| | ) | |
| (The People of the State of Illinois, | ) | Nos. 20 JA 00020 |
| | ) | 20 JA 00021 |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| D.C., | ) | Honorable |
| | ) | Demetrios Kottaras |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Lavin concurred in the judgment.

**ORDER**

¶ 1     *Held*: The circuit court's adjudication and disposition orders are affirmed where the minor's unsubstantiated statement regarding Indian ancestry was insufficient to implicate the provisions of the Indian Child Welfare Act of 1978 (25 U.S.C. § 1912(a) (2018)) and the findings of abuse and neglect were not against the manifest weight of the evidence.

¶ 2 Respondent, D.C., is the biological mother of the two named minors, Z.C. (hereinafter Za.C.) (20 JA 00020) and Z.C. (hereinafter Zh.C.) (20 JA 00021). In an adjudication order entered on September 28, 2021, the circuit court found the minors to be abused and neglected pursuant to the Juvenile Court Act of 1987 (Act) (705 ILCS 405/2-3 (West 2020)) and awarded guardianship of the minors to the Department of Children and Family Services (DCFS). On appeal, respondent requests that the adjudication and disposition orders be vacated, arguing that (1) the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1912(a) (2018)) was implicated in the case, such that the verification and notice requirements were triggered, and (2) the circuit court erred in finding that the minors were abused and neglected where there was no corroboration of the minors' statements. For the following reasons, we affirm.

¶ 3                                     I. BACKGROUND

¶ 4 Respondent is the mother of Za.C. (born November 6, 2003) and Zh.C. (born May 21, 2007), as well as A.C. (born May 3, 2001), who was not involved in this case. The biological father is unknown, and after multiple continuances and the State providing proof of service by publication, the father was defaulted.

¶ 5 On January 7, 2020, the State filed petitions for adjudication of wardship for Za.C. and Zh.C., alleging abuse and neglect pursuant to section 2-3 of the Act (705 ILCS 405/2-3(1)(a)-(b), (2)(ii) (West 2020)). The State alleged the following facts in support of its petition regarding Za.C.:

"On or about December 27, 2019, this minor ran away from home and stated that he did so due to living conditions with mother and in mother's home. This minor and this minor's sibling reported that they have lived without functioning heat, electricity, and plumbing at various times. This minor and this minor's sibling report that they often have no food or only spoiled food to eat. This minor reported that mother has repeatedly locked

him and his sibling in the house. This minor's sibling reports being locked in a basement. This minor reports having to use a bucket when the toilet was not functioning. This minor and this minor's sibling report that mother has beaten them in the past for speaking with a DCFS investigator. This minor and this minor's sibling report feeling unsafe with mother. Relatives express concern for this minor and this minor's sibling due to mother's treatment of the minors. Father's identity and whereabouts are unknown."

The petition for Zh.C. contained nearly identical allegations. The petitions were accompanied by an affidavit from DCFS investigator Samantha Sanders documenting DCFS's efforts. Therein, Sanders averred that she received a report alleging inadequate shelter and environmental neglect. She averred that, Za.C. informed her that there were no working utilities and respondent gives them expired food or no food at times. She further averred that, Za.C. also expressed fear of respondent because she has a history of physical abuse with him and his siblings.

¶ 6    On the same day, respondent testified before the court. She testified that she lived on the 7000 block of South Phillips Street in Chicago, Illinois. She then responded in the negative when asked: "Do you have any reason to think that any of your children may be eligible to be a member of an American Indian tribe?"

¶ 7    The State filed motions for temporary custody of the minors, which the court granted. An order was entered allowing for supervised visits with respondent if the minors wished for her to visit. The court also entered an order requiring the pertinent utility entities to release information concerning respondent's home, though no such exhibits were ever admitted into the record.

¶ 8    The court held the adjudication hearing on September 28, 2021. Respondent was not present at the hearing but was represented by counsel who was present and participated. At the hearing, Sanders testified to the following.

¶ 9    She was assigned on December 27, 2019, to investigate allegations of inadequate shelter and environmental neglect with regard to Za.C. and Zh.C. At the time of the investigation, Za.C. was 16 years old and Zh.C. was 12 years old. The case was a "Sequence E" at the time, indicating that the family has been the subject of four prior DCFS investigations. The narrative Sanders received stated that Za.C. ran away after he and Zh.C. were kicked out of respondent's paramour's home; he was afraid of respondent; and he was concerned because their previous home did not have working utilities. There was also information regarding previous DCFS investigations, as well as a history of respondent's paramour physically abusing Za.C. with respondent's knowledge.

¶ 10    Sanders went to the Phillips Street home, which was a three-flat apartment building owned by respondent. Receiving no response at the building, she then called respondent and explained to her that she was from DCFS. Respondent stated that, Za.C. had run away, that he was mentally ill, and that she was focused on finding him. Sanders did not disclose the precise reason to respondent for her involvement.

¶ 11    Sanders then met with Za.C., who was located at a relative's home. Za.C.'s adult sister, maternal aunt, and grandmother were present; however, Sanders spoke with Za.C. one-on-one. He informed Sanders that he was fearful of respondent, especially because he had run away and she would treat him poorly if she found him; respondent would hit him and his brother again now that she was no longer with her paramour; respondent would sometimes lock them out of the house or leave them at a restaurant while she would gamble; he did not want to return to the Phillips Street home where there was no heat, water, or electricity and he would have to sleep on the floor; he mentioned that at times they would have to urinate and defecate in a bucket because the toilet did not work; he expressed concern for Zh.C. who was still with respondent; he explained that DCFS had been involved in the past; respondent had trained him and his siblings not to speak with DCFS;

and, if they did, respondent would put them in cold water and spank them. Regarding the Phillips Street home, Za.C. stated that respondent would keep him and his siblings on the third floor as punishment and the second floor would be cleaned up when DCFS was involved. He stated that Sanders should make sure that respondent shows her both the second and third floors of the building. Additionally, he stated that sometimes respondent would lock them in the basement by putting boards over the door. That day, Za.C. had been exchanging text messages with Zh.C., who informed him that he had not eaten that day. Finally, Za.C. informed Sanders that, in reference to his mother, this was not living, but surviving.

¶ 12    Sanders next scheduled a home visit with respondent. However, respondent canceled, stating that Zh.C. had a doctor's appointment. At some point, respondent had also informed Sanders that she was currently living with a friend, not at the Phillips Street home. On January 6, 2020, respondent came to Sanders' office unannounced. Respondent had Zh.C. with her. Sanders spoke with Zh.C. in private. He informed Sanders that they were in fact living at the Phillips Street home with no gas, no water, and no electricity at that time, and the food in the home was expired. He stated that, if they spoke with a DCFS employee, respondent would put him in water and spank him and that it hurts more when you are wet. He further stated that he did not feel safe with respondent. At that time, Sanders' supervisor took custody of Zh.C. and Sanders went to Za.C.'s school to pick him up. When she picked him up, Za.C. admitted that he had been afraid that it was respondent picking him up and he appeared relieved that it was Sanders there instead.

¶ 13    Sanders indicated the case for inadequate shelter and environmental neglect because there were ongoing allegations of no working utilities in the home and no food or expired food. Sanders also stated that respondent never denied the allegations.

¶ 14    On cross-examination, Sanders confirmed that both of the minors appeared clean when she saw them, and she did not observe any bruising on either child. She never investigated the Phillips Street home.

¶ 15    In closing, the State argued, and the public guardian agreed, that it had proven by a preponderance of the evidence that both minors were neglected due to a lack of care and injurious environment and were abused due to a substantial risk of injury. Respondent's counsel argued that there was no corroboration of the minors' statements to Sanders. In rebuttal, the State argued that the minors corroborated each other's statements.

¶ 16    At the conclusion of the evidence and arguments, the court stated that it found "the testimony to be uncontradicted, uncontroverted, and credible." The court entered an adjudication order, finding that Za.C. and Zh.C were abused or neglected as defined in the Act due to lack of care, injurious environment, and a substantial risk of physical injury. In particular, the court noted that, Za.C. "ran away from home because of living conditions with mother and in mother's home[,]" the home lacked heat, electricity, and plumbing at various times, and the minors reported feeling unsafe in respondent's care.

¶ 17    On the same day, a disposition hearing was held. The court took judicial notice of the evidence and findings from the adjudication hearing. Because respondent does not specifically take issue with the disposition order on appeal, we briefly summarize the evidence submitted and the testimony heard at the disposition hearing.

¶ 18    The State entered into the record DCFS's Integrated Assessment (IA) for the minors. Information in the IA was obtained from prior DCFS investigations and interviews with both minors, their older sister, and their foster parent. The IA noted that DCFS case notes from 2015 and 2018 that revealed a history of violence and inadequate shelter. The IA also included more

detailed statements from the minors that expanded on the previous allegations above. Relevant to this appeal, the interview with Za.C. reported that he "self-identified as multi-racial with 'Dominican, Caucasian, and Black' with a maternal family history from his great grandmother of Sioux descent."

¶ 19　　Daniel Chandler, a supervisor with Child Link, testified that he was assigned to this case in November 2020. The minors were initially placed with their maternal aunt but had been living in a traditional non-relative foster home since July 2021. Chandler's colleague, Andris Wofford, conducted a visit to the foster home on September 23, 2021. According to Wofford, the home was safe and appropriate, and the minors were doing well in school. They were not receiving services but were on the waitlist for therapy. Neither of the minors have had contact with respondent, except for letters on their birthdays. Respondent does not call the minors and did not provide a home address on the letters, only a P.O. box. The last in-person contact with respondent was in the fall of 2020. Respondent did not make herself available for an assessment and, for that reason, had not been offered any services.

¶ 20　　At the conclusion of the hearing, the court entered a disposition order, adjudging Za.C. and Zh.C. as wards of the court. The court found that respondent was "unable for some reason other than financial circumstances alone to care for, protect, train, or discipline the minor[s] and/or unwilling to care for, protect, train, or discipline the minor[s]." Further, the order stated that attempts at family reunification and preservation were unsuccessful, and it was in the best interest of the minors to remove them from respondent's custody.

¶ 21　　This appeal followed.

¶ 22　　　　　　　　　　　　　　　II. ANALYSIS

¶ 23    On appeal, respondent argues that the circuit court erred: (1) in failing to comply with the ICWA where there was evidence in the record that the minors were Indian children and (2) in adjudicating the minors to be abused and neglected where the findings were based on uncorroborated statements from the minors.

¶ 24                              A. The Indian Child Welfare Act

¶ 25    The ICWA was enacted by Congress to address the "abusive welfare practices which separated large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *In re C.N.*, 196 Ill. 2d 181, 203 (2001). The main purpose of the ICWA is to determine the jurisdiction over Indian child custody proceedings. *Id.*

¶ 26    Relevant here, the ICWA provides requirements, such as verification and notice, when the circuit court has reason to know that the minor involved in custody proceedings is an Indian child. 25 U.S.C. § 1912(a) (2018)); *In re T.A.*, 378 Ill. App. 3d 1083, 1090 (2008). Specifically, the ICWA provides as follows:

> "In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention."

25 U.S.C. § 1912(a) (2018)).

¶ 27    The ICWA defines an Indian child as "any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) [ ] eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe[.]" 25 U.S.C. § 1903(4) (2018)). Additionally, the Bureau of Indian Affairs has issued guidelines and regulations providing that a

court has reason to know an Indian child is the subject of proceedings in the following circumstances:

"(1) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that the child is an Indian child;

(2) Any participant in the proceeding, officer of the court involved in the proceeding, Indian Tribe, Indian organization, or agency informs the court that it has discovered information indicating that the child is an Indian child;

(3) The child who is the subject of the proceeding gives the court reason to know he or she is an Indian child;

(4) The court is informed that the domicile or residence of the child, the child's parent, or the child's Indian custodian is on a reservation or in an Alaska Native village;

(5) The court is informed that the child is or has been a ward of a Tribal court; or

(6) The court is informed that either parent or the child possesses an identification card indicating membership in an Indian Tribe."

25 C.F.R. § 23.107(c) (2018); see also Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Fed. Reg. 10146-02 (Feb. 25, 2015); Guidelines for Implementing the Indian Child Welfare Act, 81 Fed. Reg. 96476-01 (Dec. 30, 2016).

¶ 28 Significantly, "unsubstantiated" or "brief references in the record" to Indian heritage are insufficient to trigger the ICWA. *C.N.*, 196 Ill. 2d at 206. Further, "[t]he party asserting the applicability of the [ICWA] has the burden of producing sufficient evidence for the court to determine if the child is an Indian child." *T.A.*, 378 Ill. App. 3d at 1090. Whether the circuit court

was required to make such a determination is a legal issue which we review *de novo*. *C.N.*, 196 Ill. 2d at 203.

¶ 29    Here, respondent contends that, despite evidence contained in the IA that the minors may be Indian children, the circuit court failed to make a determination as to the applicability of the ICWA. The public guardian, representing the minors, and the State both contend that the circuit court neither knew nor had reason to know that either of the minors were Indian children. We agree with the public guardian and the State for the following reasons.

¶ 30    In *In re C.N.*, the references in the record consisted of testimony from the caseworker that the father reported that he was part of a Native American tribe, as well as the father's psychological assessment that included the father's statement that he was the son of a "full-blooded Blackfoot Indian." 196 Ill. 2d 181, 205-06 (2001). Our supreme court concluded that the brief references in the record to alleged Indian heritage was insufficient to implicate the ICWA. *Id.* at 206.

¶ 31    Respondent attempts to distinguish *C.N.* from the case before us. In particular, she claims that in *C.N.*, "the caseworker actually looked into the matter, and apparently concluded that [ ] there was no tribal membership[,]" whereas here respondent "said that she was unaware of American Indian heritage, her son mentioned it, and no references to any follow-up were made of record." Although true that the father in *C.N.* requested that the caseworker pursue the matter of his Native American heritage and the caseworker testified that she "had to pursue" the matter, there are no statements in the opinion regarding the results of her alleged investigation. *C.N.*, 196 Ill. 2d at 205. Further, in concluding that the ICWA was not triggered, our supreme court did not address the alleged investigation of the father's ancestry *Id.* at 206-07. Thus, we do not find this distinction sufficient to alter our conclusion.

¶ 32    We find *In re Anaya J.G.*, 403 Ill. App. 3d 875 (2010), and *In re T.A.*, 378 Ill. App. 3d 1083 (2008), to which the public guardian cites in support of its argument, instructive. Notably, both appellate court cases were released several years after *C.N.* In *Anaya J.G.*, the appellate court held that the ICWA was not triggered where the trial court did not have sufficient reason to suspect the minor was of Indian heritage. 403 Ill. App. 3d at 882. The court noted that no evidence was presented at trial that demonstrated that the minor or her biological parents were members of an Indian tribe. *Id.* at 881. The only statements in the record consisted of the mother's statement that there was "Cherokee blood on her deceased mother's side of the family" and the father's statement that he also believed the maternal grandmother was a Cherokee Indian. *Id.* Neither was aware of any relative registered as a member of the Cherokee tribe. *Id.* at 881-82. The appellate court considered these to be merely "bare assertions without any evidence" and concluded that the trial court did not have reason to know that the minor was an Indian child. *Id.* at 882.

¶ 33    Similarly, in *T.A.*, the appellate court found that the evidence of the child's Indian heritage was "unsubstantiated and vague" and did not give the circuit court "reason to know" that the minor was an Indian child for purposes of triggering the requirements of the ICWA. 378 Ill. App. 3d at 1094. In particular, the evidence consisted of the mother's statements to the DCFS caseworker that "she was of Native American descent and that, to her knowledge, none of her family members were registered with any tribes." *Id.* at 1093. The court stated, "the mere mention of Indian heritage does not give a trial court reason to know that the child is an Indian child." *Id.* at 1092. Further, while DCFS was in the process of seeking out additional information regarding the mother's claim of Indian ancestry, the parties agreed to continue the proceedings and that an order could be vacated if additional information necessitated the application of the ICWA. *Id.* at 1093. Thus, the

court found that the record, at the time the dispositional order was entered, was insufficient to trigger the ICWA. *Id.*

¶ 34    In the present case, respondent specifically testified that she did not believe that either of the minors had any Indian heritage. In the IA, however, an interview with Za.C. contained information that respondent "has a history of Sioux ancestry." Like in *T.A.* and *Anaya J.G.*, this brief reference in the record to an unsubstantiated statement concerning respondent's alleged Indian heritage was simply insufficient to implicate the provisions of the ICWA, especially where respondent herself expressly denied having Indian ancestry. Accordingly, the circuit court did not err in failing to make a determination on the applicability of the ICWA, and thus, respondent's argument on this issue is without merit.

¶ 35                          B. Adjudication of Abuse and Neglect

¶ 36    We now turn to the circuit court's adjudication order, finding that the minors are abused and neglected.

¶ 37    The Act sets forth the procedures the trial court must follow in determining whether a minor should be removed from his or her parents' custody and made a ward of the court. *In re Arthur H.*, 212 Ill. 2d 441, 462-63 (2004). The process is initiated when the State files a petition for wardship, and the minor is placed in temporary custody. *Id.* at 462. From there, the trial court conducts an adjudicatory hearing, where "the court shall first consider only the question whether the minor is abused, neglected or dependent." 705 ILCS 405/2-18(1) (West 2020). If the trial court determines that a minor is abused or neglected at the adjudicatory hearing, the court then conducts a dispositional hearing. 705 ILCS 405/2-21(2) (West 2020). At the dispositional hearing, the trial court determines "whether it is consistent with the health, safety and best interests of the minor and the public that [the minor] be made a ward of the court." *Id.*

¶ 38    "[C]ases involving allegations of neglect and adjudication of wardship are *sui generis* and must be decided on the basis of their unique circumstances." *Arthur H.*, 212 Ill. 2d at 463. Pertinent to this appeal, sections 2-3(1)(a) and (b) of the Act (705 ILCS 405/2-3(1)(b) (West 2020)) define a "neglected minor" to include "any minor under 18 years of age *** who is not receiving the proper or necessary support, education as required by law, or medical or other remedial care recognized under State law as necessary for a minor's well-being" or "whose environment is injurious to his or her welfare[.]" " 'Neglect' is defined as the ' "failure to exercise the care that circumstances justly demand." ' " *Arthur H.*, 212 Ill. 2d at 463 (quoting *In re N.B.*, 191 Ill. 2d 338, 346 (2000), quoting *People ex rel. Wallace v. Labrenz*, 411 Ill. 618, 624 (1952)). "The term 'injurious environment' is an amorphous concept that cannot be defined with particularity but has been interpreted to include the breach of a parent's duty to ensure a safe nurturing shelter for her children." *In re M.D.*, 2021 IL App (1st) 210595, ¶ 24. Pursuant to section 2-3(2)(ii) of the Act (705 ILCS 405/2-3(2)(ii) (West 2020)), an abused minor includes a minor whose parent "creates a substantial risk of physical injury to such minor by other than accidental means which would be likely to cause death, disfigurement, impairment of emotional health, or loss or impairment of any bodily function."

¶ 39    In adjudication proceedings such as the one before us, the State has the burden of proving allegations of neglect or abuse by a preponderance of the evidence. *In re A.P.*, 2012 IL 113875, ¶ 17. Stated another way, "the State must establish that the allegations of neglect are more probably true than not." *Arthur H.*, 212 Ill. 2d at 464. A reviewing court will not reverse a trial court's ruling

of neglect unless it is against the manifest weight of the evidence.[1] *Id.* "A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident." *Id.*

¶ 40    With these principles in mind, we consider the merits of this case. Briefly, in each of the separate petitions, the State alleged that both minors were neglected due to an injurious environment and lack of care and were abused in that they were subject to a substantial risk of physical injury. See 705 ILCS 405/2-3(1)(a)-(b), (2)(ii) (West 2020). The evidence presented at the hearing consisted of Za.C. and Zh.C.'s statements to Sanders that respondent put them in water and hit them if they spoke with DCFS employees; their home did not have heat, electricity, or water; and they did not eat regularly and if they did eat, it was often spoiled or expired food. Ultimately, the circuit court found that Za.C. and Zh.C.'s statements to Sanders regarding their living situation, as well as respondent's behavior towards them, constituted sufficient evidence to support a finding of abuse and neglect.

¶ 41    On appeal, respondent contends that there was insufficient evidence to support the court's finding. She maintains that, in the absence of either independent corroboration or cross-examination of the subject minors, Sanders' testimony could not support the court's judgment. Respondent argues that because "corroboration by other minors' making overlapping hearsay statements should not suffice under a proper construction of section 2-18(4)(c) of the [Act,]" the adjudication orders should be reversed as against the manifest weight of the evidence.

---

[1] In its response brief, the public guardian asserts that respondent argues for *de novo* review. We understand respondent's position on the standard of review to be consistent with that of both the public guardian and the State, *i.e.,* manifest weight of the evidence. In her brief, respondent, citing *NDC, LLC v. Topinka*, 374 Ill. App. 3d 341, 358 (2007), simply asserts that to the extent the construction of the relevant statute is involved, the standard of review is *de novo*. We perceive no dissonance between the parties on the proper standard of review for adjudication orders.

¶ 42 The public guardian takes the position, and the State agrees, that the minors' statements to Sanders were reciprocally corroborative. Thus, the minors' statements were appropriate under the Act and ultimately supported the trial court's finding of abuse and neglect.

¶ 43 The Act carves out a hearsay exception and permits a minor's out-of-court statements to be admitted into evidence at an adjudicatory hearing to determine whether the minor is abused or neglected. 705 ILCS 405/2-18(4)(c) (West 2020); *In re J.L.*, 2016 IL App (1st) 152479, ¶ 87. "However, no such statement, if uncorroborated and not subject to cross-examination, shall be sufficient in itself to support a finding of abuse or neglect." 705 ILCS 405/2-18(4)(c) (West 2020). Our supreme court has interpreted this section to require *either* cross-examination or corroboration, but not both. *In re A.P.*, 179 Ill. 2d 184, 196 (1997); see also *In re An.W.*, 2014 IL App (3d) 130526, ¶ 62 (minor's hearsay statement is sufficient if either (1) the minor is subject to cross-examination or (2) the occurrence of abuse or neglect is corroborated by other evidence). As neither of the minors testified during the adjudication hearing and thus were not subject to cross-examination, the issue before us, which the parties dispute on appeal, is whether there was sufficient corroboration.

¶ 44 Whether sufficient corroboration exists is determined on a case-by-case basis. *In re Gabriel E.*, 372 Ill. App. 3d 817, 825 (2007). Our supreme court has discussed the meaning of "corroboration" within the context of the Act as follows:

"[C]orroborating evidence of the abuse or neglect requires there to be independent evidence which would support a logical and reasonable inference that the act of abuse or neglect described in the hearsay statement occurred. In essence, corroborating evidence is evidence that makes it more probable that a minor was abused or neglected. The form of

corroboration will vary depending on the facts of each case and can include physical or circumstantial evidence."

*A.P.*, 179 Ill. 2d at 199. Further, the court stated that "witnesses testifying that a minor related claims of abuse or neglect to them" will not be considered sufficient corroboration. *Id.* at 198.

¶ 45    In *A.P.*, upon which the public guardian relies, the court determined that the minor's "hearsay statements that she was sexually abused were sufficiently corroborated" where there was also a medical examination that resulted in a diagnosis of sexual abuse. *Id.* at 199-200. Although the supreme court's discussion of corroboration is helpful to our analysis, the facts and circumstances of that case are dissimilar from those in the case before us, such that we do not find *A.P.* to be directly on point.

¶ 46    Similarly, *Alexis H.*, 401 Ill. App. 3d 543 (2010), to which the public guardian additionally cites for support, although helpful, is not wholly on point. There, the appellate court, after reciting the same principles of law derived from *A.P.*, agreed with the trial court "that the children's statements of sexual abuse corroborated each other's statements, and those statements make it more probable that the children were abused." *Id.* at 561. Nonetheless, this court also recognized that the statements were additionally corroborated by the fact that the children described the physical acts of sexual abuse in such a detailed fashion that would be unexpected of children their age, and the record included the results of a medical examination of one of the children showing an open hymen at 8 years old, which was considered abnormal. *Id.* at 562. Thus, it appears that the finding of abuse was not based solely on the statements of the minors. As such, we concur with respondent that *A.P.* and *Alexis H.* are distinguishable from the circumstances before us because neither of those cases solely relies on the minors' statements to support the findings of abuse or neglect.

¶ 47    For additional support, the public guardian cites to *J.L.*, 2016 IL App (1st) 152479, *In re D.M.*, 2016 IL App (1st) 152608, and *In re B.W.*, 216 Ill. App. 3d 410 (1991). The main import of these cases is that a non-party minor's statements of abuse or neglect are admissible as evidence of abuse or neglect of a sibling. *J.L.*, 2016 IL App (1st) 152479, ¶ 93; *D.M.*, 2016 IL App (1st) 152608, ¶ 30; *B.W.*, 216 Ill. App. 3d at 415-16. The hearsay exception contained in section 2-18(4)(c) (705 ILCS 405/2-18(4)(c) (West 2020)) is not limited to hearsay statements of the named minor in the petition. *J.L.*, 2016 IL App (1st) 152479, ¶ 93. Additionally, "[e]vidence of abuse, neglect, or dependency of one minor is admissible evidence on the issue of abuse, neglect, or dependency of any other minor for whom the respondent is responsible." *B.W.*, 216 Ill. App. 3d at 415-16. Thus, we see no impediment here to Za.C.'s statement providing evidence of abuse and neglect in Zh.C.'s case and vice versa.

¶ 48    Nonetheless, we note that, as in *A.P.* and *Alexis H.*, none of the cited cases above relied *solely* on siblings' reciprocal out-of-court statements to make findings of abuse and neglect. See *J.L.*, 2016 IL App (1st) 152479, ¶¶ 91-92, 98-99 (the trial court did not err in relying on one sibling's out-of-court statements regarding her own abuse to corroborate the named sibling's hearsay statements; however, there was additional corroboration from medical records and the descriptions contained in the allegations of sexual abuse); *D.M.*, 2016 IL App (1st) 152479, ¶ 32 (minor's statements regarding her own sexual abuse were admissible as evidence of neglect of her siblings and were corroborated by perpetrator's admission, although the reviewing court also held that the admission was substantive evidence that could, on its own, support the allegations in the petition); *B.W.*, 216 Ill. App. 3d at 416 (minor's hearsay statement regarding the perpetrator's abuse of his sibling was admissible as evidence that both siblings were abused or neglected and was corroborated by testimony from a doctor and medical evidence).

¶ 49    Even so, this court has in at least two instances expressly remarked that the out-of-court statement of one minor can corroborate the hearsay statement of another minor. See *Alexis H.*, 401 Ill. App. 3d at 561; *J.L.*, 2016 IL App (1st) 152479, ¶ 92. As such, based on these cases, we find that where both minors provide substantially similar statements regarding abuse or neglect, a court may conclude that sufficient corroboration has been provided to satisfy the provisions of the Act. In the instant case, both minors stated that there was no gas, heat, or electricity at the home; they had only expired food to eat at home; respondent would put them in water and spank them; and they did not feel safe with respondent. The caseworker attempted to corroborate the minors' statements regarding the living situation, but respondent cancelled the scheduled home visit. Nonetheless, the minors' similar statements corroborated one another and established that the allegations of abuse and neglect more probable than not. Accordingly, the circuit court did not err in concluding that there was sufficient evidence for a finding of abuse and neglect in regard to the minors.

¶ 50    Finally, we reject respondent's reliance on *In re Alba*, 185 Ill. App. 3d 286 (1989), a decision from our sister district. In *Alba*, the Second District found insufficient corroboration of a minor's hearsay statement regarding sexual abuse. Respondent specifically points to the court's statement that "evidence which is in itself hearsay cannot provide corroboration required by the statute." *Id.* at 290. In *Alba*, an interview with the minor included descriptions of being touched by the father and the minor also drew a picture of her father and herself. *Id.* at 287-88. The reviewing court found that the minor's drawing constituted hearsay and could not corroborate the minor's statements of abuse. *Id.* at 290. Notably, the proffered corroboration for the minor's statement was the minor's own drawing, which was created during the same interview in which the statement was made.

¶ 51    We find *In re Alba* markedly different from the case now before us. " 'Hearsay evidence is an out of court statement offered to prove the truth of the matter asserted[ ] and is generally inadmissible unless it falls within a recognized exception.' " *In re Brandon A.*, 395 Ill. App 3d 224, 236 (2009) (quoting *People v. Cloutier*, 178 Ill. 2d 141, 154 (1997)). " 'However, an out of court statement not offered for the truth of the matter asserted is not hearsay.' " *Id.* (quoting *People v. Malave*, 230 Ill. App. 3d 556, 560 (1992)). Strictly speaking, here, unlike in *Alba,* Za.C.'s statements regarding his own abuse were offered, not for proof of the abuse alleged in the petition filed on his behalf, but to corroborate the allegations alleged in the petition filed on behalf of Zh.C, and vice versa. See also *J.L.*, 2016 IL App (1st) 152479, ¶ 92 (similarly distinguishing *Alba* where the corroboration for the minor's statements did not consist of the minor's own statements or actions). Thus, neither minor's statements, when offered for that purpose, constituted hearsay. In *Alba*, the drawing by the minor victim was not independent corroboration but was instead an additional form of her own hearsay statement regarding the alleged abuse. To that extent, we believe *Alba,* although distinguishable from our case*,* is consistent with *A.P.*'s requirement that the corroborative evidence be independent. See 179 Ill. 2d at 199.

¶ 52    Simply put, to corroborate means " 'to add weight or credibility to a thing by additional and confirming facts or evidence.' " *Alba*, 185 Ill. App. 3d at 290 (quoting *In re Custody of Brunken*, 139 Ill. App. 3d 232, 239 (1985)). In the criminal context, there is no requirement that corroborating evidence prove commission of an offense beyond a reasonable doubt. See *People v. Sargent*, 239 Ill. 2d 166, 183 (2010). The same is true in the context of these proceedings. The corroborating evidence need only to have "add[ed] weight or credibility" to the out of court statements. As such, we find a substantially similar statement from one minor regarding his own alleged abuse to constitute independent corroborating evidence of another minor's abuse.

¶ 53    Because the minors' statements provided sufficient corroboration for one another, we do not find the circuit court's findings to be against the manifest weight of the evidence where the opposite conclusion—that the minors were not abused or neglected—is not clearly evident. Thus, the underlying adjudication order is affirmed, as well as the disposition order.

¶ 54                                    III. CONCLUSION

¶ 55    For the reasons stated, we affirm the judgment of the circuit court.

¶ 56    Affirmed.