2025 IL App (4th) 230502-U

NO. 4-23-0502

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

FILED
September 3, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Winnebago County |
| DEVONTE HYLER, | ) | No. 20CF1233 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Debra D. Schafer, |
| | ) | Judge Presiding. |

JUSTICE CAVANAGH delivered the judgment of the court.
Justices Knecht and Grischow concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, finding (1) the trial court did not abuse its discretion when it permitted the testimony of a jailhouse informant at trial and (2) the evidence was sufficient for a jury to reasonably conclude defendant was guilty beyond a reasonable doubt of first degree murder.

¶ 2    Defendant, Devonte Hyler, was convicted by a jury of first degree murder (720 ILCS 5/9-1(a)(2) (West 2020)). On appeal, he argues (1) the trial court erred when it permitted the trial testimony of a jailhouse informant and (2) the evidence was insufficient to convict him of first degree murder. We affirm.

¶ 3                          I. BACKGROUND

¶ 4    In July 2020, defendant was charged by information with six counts of first degree murder (*id.* §9-1(a)(1), (2)) related to the shooting death of Jwan Lamon on April 9, 2020. He was subsequently indicted for the same offenses by a grand jury in February 2021.

¶ 5                                        A. Pretrial Proceedings

¶ 6            In August 2022, the State filed a motion *in limine* seeking a reliability hearing pursuant to section 115-21 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-21 (West 2022)) to admit statements made by defendant to Xavier Brooks while the two were incarcerated together at the Rock County jail in Wisconsin. The reliability hearing occurred on August 15, 2022, just prior to trial.

¶ 7            Prior to testifying at the hearing, Brooks consulted with his attorney. Before his direct examination, Brooks interjected with the following statement:

> "Before we *** even start, [Y]our Honor, I *** don't want to do this. I don't want to be in the middle of this. I told the State that I don't want to be in a part—like, this is a tough seat, like, with both sides. I don't got nothing to do with it. I just told my attorney, like, I didn't even know I was coming over here right now to do this."

¶ 8            Brooks testified he had been housed in the same pod of the Rock County jail with defendant. He confirmed he knew who defendant was and had conversations with him while they were incarcerated together. Brooks denied having ever been a paid informant or testifying in exchange for a reduced sentence. When the State asked Brooks if defendant gave him information about "a situation" involving Lamon, he reiterated he was not getting "in the middle of it" and stated he would not "testify against [defendant]."

¶ 9            Brooks confirmed he spoke with the prosecutor in the presence of his attorney at the jail a week prior to the hearing. He confirmed he had a pending criminal case in Winnebago County where he had received a plea offer. He stated his offer had nothing to do with defendant's case and he would not receive any benefit from testifying. He confirmed he spoke

with Winnebago County Sheriff's Office deputies in 2020 in a recorded interview while he was incarcerated at the Rock County jail, but he could not recall if the subject of that conversation pertained to defendant. He recalled speaking with deputies only once. The State indicated Brooks's testimony did not go as anticipated and requested a brief continuance to secure the testimony of an additional witness for the hearing.

¶ 10 The trial court asked defense counsel if he had received Brooks's "complete criminal history." Counsel stated he had received the National Crime Information Center (NCIC) report but had not received a copy of Brooks's pending charges in Winnebago County. The court provided counsel with a copy of the bill of indictment for Brooks's pending charges. Counsel also stated he had not received a bystander's report regarding Brooks's interview with the prosecutor from the week before. The court confirmed with the prosecutor that Brooks's statement to her was not different from what he had said during his recorded interview. The court confirmed with defense counsel that he had "information about the time and place of the statements, the time and place of their disclosure to law enforcement, and the names of all persons who were present when the statements were made." The court asked counsel if he had information regarding whether Brooks had ever recanted his testimony or statements. Counsel stated he did not have that information and believed Brooks had recanted his statements to the prosecutor. The court noted the prosecutor did not plan to have any witnesses other than Brooks testify at the reliability hearing, which suggested Brooks had not recanted his statement. Additionally, the court stated Brooks's testimony at the hearing was not "really a recantation" because Brooks had said "he doesn't remember; he's not disavowing what was said." The prosecutor confirmed to the court that all the information relevant to Brooks's credibility had been tendered to defendant.

¶ 11        The reliability hearing resumed with Detective Christopher Moski testifying he had conducted a recorded interview of Brooks on May 19, 2020. Moski denied threatening Brooks or offering him anything in exchange for his interview. He confirmed he had listened to the recording and that it was a fair and accurate copy of the interview. The interview was admitted into evidence. Upon its own questioning, the trial court learned Lamon and Brooks were friends and Lamon was believed to have killed D'Wan Buchanan, who was defendant's cousin. The court asked Moski if he was able to verify any information Brooks had given him. Moski stated Buchanan had been killed and Lamon was investigated but never "arrested" in connection with Buchanan's death.

¶ 12        The State informed the trial court Brooks had received a plea offer of 10 years' imprisonment in exchange for pleading guilty to child pornography and aggravated criminal sexual abuse. The State indicated the plea offer was given to Brooks prior to him speaking with the prosecutor.

¶ 13        The trial court stated it was applying a preponderance of the evidence standard to determine whether Brooks's recorded statement was reliable. The court said the recorded statement "sounded as if" Brooks had reached out to law enforcement for an interview about his conversation with defendant. The court stated it had reviewed a summary of the interview by way of a police report wherein Brooks had indicated he had "connections" with both the victim and defendant. The court stated Brooks "sp[oke] freely" during the interview and was not "reluctant" like he was at the hearing. The court found it was reliable. The court, however, instructed the State that an occurrence witness to the shooting of Lamon would be required to testify first, and the court reserved revisiting its ruling after that witness's testimony. The court also noted there was no evidence Brooks had received any benefit in connection with his

- 4 -

statement or testimony regarding this matter. The matter proceeded to a jury trial.

¶ 14                                 B. Jury Trial

¶ 15        Prior to trial commencing, the State elected to proceed solely on counts V and VI of the indictment.

¶ 16        At trial, John Gordon testified he drove a Chevrolet Trax to a friend's house in Beloit, Wisconsin, to purchase cocaine. While at his friend's house, two individuals asked Gordon for a ride to South Beloit, Illinois, and Gordon agreed. He described one individual as wearing a hat and did not recall seeing hair under the hat. He did not know this individual but had seen him before and believed he went by the name "Little D." This individual sat in the front passenger seat and was later identified as defendant. The other individual, who Gordon said went by "Breezy," was wearing a hat with possibly dreadlocks underneath and "all black" clothing. This individual sat in the rear seat directly behind Gordon. Gordon stated both individuals passed "weapons" back and forth to each other. He recalled defendant turned up the music and then shot the rear passenger "four or five" times. Gordon stated he jumped from the vehicle that was still traveling 30 miles per hour. He said he tried to run but kept falling because he had injured his knee when jumping. Photographs were admitted into evidence showing swelling and abrasions to Gordon's left knee. He said he tried to hide but eventually went to nearby homes hoping to use a phone. Gordon was able to get a homeowner nearby to contact the police, who then gave him a ride back to Beloit.

¶ 17        Gordon contacted OnStar for assistance in locating his vehicle and was told to report his vehicle stolen, which he did. After locating it, Gordon went with Dave Hendrickson and Brittany McIntyre to retrieve the vehicle. McIntyre observed Lamon's body in the rear seat and called the police. Gordon stated he did not immediately contact police because he was in

"shock" and "scared for [his] life." A photograph showing a hat discovered in the back seat of the Trax was admitted into evidence. Gordon stated he had not seen the hat before. A photograph showing a crumpled memorial card from Buchanan's memorial service was also admitted into evidence. Gordon denied ever seeing the memorial card or placing it in the vehicle. Photographs showing damage to the front of the Trax were admitted into evidence. Gordon denied the Trax had the damage as shown in the photos prior to him jumping from the vehicle.

¶ 18    On cross-examination, Gordon denied telling police his car had broken down. He admitted he originally told a police officer he had gotten into an argument with his girlfriend and left his vehicle. He stated he had been followed by drones after the night of the incident, but they had stopped following him after he moved away from Beloit.

¶ 19    McIntyre testified she was under court supervision for retail theft and a bail violation in Rock County but had received nothing in exchange for her testimony at defendant's trial. She stated she was previously in a relationship with Gordon. On April 14, 2020, she went with Hendrickson and Gordon to pick up Gordon's vehicle. When she opened the door, she observed "blood splatter on the front seat." She closed the door and opened the rear door and observed a body. She said the vehicle "stunk." She immediately closed the door and called the police. She originally identified herself to the police as "Mandy Stockwell" because she had outstanding arrest warrants. On April 9, 2020, she recalled speaking with Gordon by phone while he was driving. She stated she heard "one or two" other voices in the vehicle that she did not recognize. Later that evening, she met with Gordon and observed him limping. He appeared to have injured his right leg. She said his sweatpants had grass stains on the knee. She stated Gordon did not have his vehicle until they went to pick it up on April 14.

¶ 20    Hendrickson testified he lived with McIntyre in April 2020. He recalled seeing

Gordon on the morning of April 10, 2020. He noticed Gordon had injured his knee. He drove Gordon and McIntyre to pick up Gordon's vehicle on April 14, 2020.

¶ 21	Lisa Drummer testified she lived on Fischer Road in South Beloit on April 9, 2020. She recalled a man she knew as "John" knocking on her door at approximately 10 p.m. He told her his car had broken down and asked to use her phone. She said she tried to call the phone numbers he gave her, but no one answered. She said he would not leave, so she called the police. She identified Gordon as "John" and recalled he walked with a limp.

¶ 22	Deputy Jennifer Moyer testified she worked for the Winnebago County Sheriff's Office and was dispatched to Drummer's home on Fischer Road on April 9, 2020. She spoke with Gordon and gave him a ride to Beloit. She stated Gordon told her he had an argument with his girlfriend, and he left their vehicle. Gordon did not tell her he jumped out of a moving vehicle.

¶ 23	Officer Kayla Glass testified she was a police officer for the Beloit Police Department in April 2020. On April 14, 2020, she observed a Chevrolet Trax parked on the side of the road on Royce Avenue in Beloit. When she approached the vehicle, she observed blood on the front driver's and passenger seats. She retrieved the keys for the vehicle from a woman who was at the scene and opened the rear driver's side door, where she observed a deceased male seated with a guitar case partially covering his body. The deceased male was later identified as Lamon.

¶ 24	Officer Joe Cassioppi testified he was a police officer for Beloit in April 2020. He and other officers processed the scene and the vehicle on April 14, 2020, after Lamon's body was discovered. A photo showing blood on the back of the driver's seat and the position of

Lamon's body was admitted into evidence. He stated Buchanan died in November 2019 and that he had interviewed Lamon as a person of interest in Buchanan's death.

¶ 25        Tim Speer testified he was a crime scene technician for the Winnebago County Sheriff's Office. Speer investigated a potential crash site on Fischer Road. He observed an area where the grass was "laid down," shrubs had been struck, and dirt "was cast off." He also identified "several broken car pieces" in a ditch. He described the scene as a single-vehicle accident.

¶ 26        Amanda Darnell of the Illinois State Police testified she analyzed five cartridge cases recovered from Gordon's vehicle. She stated they all were from a "9-millimeter Luger."

¶ 27        Dr. Mark Peters testified he performed an autopsy on Lamon. He stated Lamon died of gunshot wounds to the head, neck, and torso.

¶ 28        Detective Brad Kaiser testified he analyzed data recovered from Lamon's cell phone. An iCloud account for Lamon's phone was recovered and identified as "team700breezy@icloud." Kaiser also explained how data from Lamon's phone placed his cell phone in the area of Fischer Road at 9:14 p.m. on April 9, 2020.

¶ 29        Detective Amber Davies testified she administered a photo array to Gordon on April 15, 2020. Gordon identified the individual from the photo array who he believed shot Lamon. Gordon told Davies he was " '[a] thousand' " percent confident in his identification of the shooter, whom he called "Little D."

¶ 30        Detective Nathan Adams testified he assisted Davies in preparing the photo array for Gordon. Adams confirmed the photo Gordon had selected was of defendant.

¶ 31        Brooks testified he spoke with Winnebago County Sheriff's Office deputies on May 19, 2020, while he was incarcerated in the Rock County jail. Brooks confirmed he shared a

pod with defendant and that they had conversations about Lamon and "things that [defendant] had done" before he was in the jail. When asked what defendant said, Brooks said he did not remember and did not want to testify. He stated he was not testifying in exchange for anything concerning his pending charges in Winnebago County. He stated he knew both defendant and Lamon, whom he referred to as "Breezy." When asked if defendant told him that he killed Lamon, Brooks stated he did not remember. He did not remember if defendant told him he had disposed of the weapon that was used. He could not recall if defendant described how he shot Lamon.

¶ 32        Detective Moski testified he interviewed Brooks in a recorded interview upon his request on May 19, 2020. He said nothing was promised to Brooks in exchange for his statement. Moski testified Brooks had described to him how defendant had demonstrated to Brooks how the shooting occurred. Portions of the audio-recorded interview were played to the jury. In the recording, Brooks explained that when defendant was arrested, the gun he was arrested with was not the gun used to shoot Lamon. Brooks stated defendant told him he had already disposed of the gun. Additionally, Brooks said defendant told him he was not wearing the same clothes from the shooting at the time of his arrest. He stated defendant said he "went crazy" and "blanked out" when Lamon told defendant he had killed his cousin, Buchanan.

¶ 33        Amanda Roden testified she used to be in a relationship with defendant toward the "end of 2019 into the spring of 2020." She confirmed Buchanan was defendant's cousin. She told the police defendant was "sad" when Buchanan died.

¶ 34        The State rested. Defendant made a motion for a directed verdict, which was denied.

¶ 35        Defendant rested.

¶ 36        The jury returned guilty verdicts on both counts.

¶ 37        In September 2022, defendant filed a motion for judgment notwithstanding verdict or for a new trial. Defendant's motion argued, *inter alia*, the trial court erred when it granted the State's motion *in limine*, finding Brooks's statements about defendant reliable and that the State had failed to prove him guilty beyond a reasonable doubt. The court denied defendant's motion.

¶ 38        In May 2023, following a sentencing hearing, the trial court merged the conviction on count V into count VI and sentenced defendant to 68 years' imprisonment.

¶ 39        This appeal followed.

¶ 40                                    II. ANALYSIS

¶ 41        On appeal, defendant argues (1) the trial court erred when it permitted the testimony of Xavier Brooks, a jailhouse informant, at trial and (2) the evidence was insufficient to convict him of first degree murder.

¶ 42                        A. Jailhouse Informant Testimony Claim

¶ 43        Pursuant to section 115-21(c)(1) to (7) of the Code (725 ILCS 115-21(c)(1)-(7) (West 2022)), when the State seeks to introduce testimony of a jailhouse informant concerning incriminating statements made by a defendant, it must disclose the following:

> "(1) the complete criminal history of the informant;
>
> (2) any deal, promise, inducement, or benefit that the offering party has made or will make in the future to the informant;
>
> (3) the statements made by the accused;

(4) the time and place of the statements, the time and place of their disclosure to law enforcement officials, and the names of all persons who were present when the statements were made;

(5) whether at any time the informant recanted that testimony or statement and, if so, the time and place of the recantation, the nature of the recantation, and the names of the persons who were present at the recantation;

(6) other cases in which the informant testified, provided that the existence of such testimony can be ascertained through reasonable inquiry and whether the informant received any promise, inducement, or benefit in exchange for or subsequent to that testimony or statement; and

(7) any other information relevant to the informant's credibility."

¶ 44 Once the State has provided the aforementioned disclosures to the defendant, the trial court is required to conduct a hearing on "whether the testimony of the informant is reliable." *Id.* § 115-21(d). The State is required to "show by a preponderance of the evidence that the informant's testimony is reliable." *Id.* The court is required to "consider the factors enumerated in subsection (c) as well as any other factors relating to reliability." *Id.* We review the trial court's reliability determination under an abuse of discretion standard. *People v. Serritella*, 2022 IL App (1st) 200072, ¶ 138. "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 45 In the case *sub judice*, defendant argues (1) the State failed to disclose the complete criminal history of Brooks; (2) the State failed to provide information as to the time and place of defendant's alleged statements to Brooks; (3) Brooks's testimony was not reliable

because he (a) did not remember specifically what he had told Moski, (b) desired to invoke his fifth amendment (U.S. Const., amend. V) privilege, and (c) did not want to provide testimony for or against defendant; and (4) Moski's testimony did not support a reliability finding because Moski could not verify Brooks's statements. We address each claim in turn.

¶ 46    At the reliability hearing, the trial court explicitly asked defense counsel whether he had received Brooks's complete criminal history. Counsel stated he had received the NCIC but not information pertaining to Brooks's pending charges. The court subsequently gave counsel a copy of the indictment. Nothing further was said about this issue. Now, on appeal, defendant—aside from asserting he had not received Brooks's complete criminal history—does not explain how the court abused its discretion or why Brooks's testimony should have been found unreliable absent a complete criminal history. We note the NCIC is a criminal justice database operated by the federal government that contains, among other things, an individual's criminal history. See *Brown v. Kelly*, 2024 IL App (4th) 231092-U, ¶ 32; see also 28 C.F.R. § 25.1 *et seq.* (2022). Furthermore, the NCIC is considered reliable. *People v. Wallace*, 2022 IL App (4th) 210475, ¶ 65. We find nothing about defendant's unsupported claim he had failed to receive Brooks's complete criminal history warrants reversing the court's ruling.

¶ 47    Next, defendant argues the State failed to provide information as to the time and place of defendant's alleged statements to Brooks. We note counsel for defendant confirmed he had received all statements alleged to have been made by defendant to Brooks. Defendant does not explain how a failure to provide the time and place defendant had made his statements to Brooks undermines Brooks's reliability or shows the trial court abused its discretion. As a reviewing court, we are

"entitled to have the issues clearly defined and supported by pertinent authority

and cohesive arguments; it is not merely a repository into which an appellant may 'dump the burden of argument and research,' nor is it the obligation of this court to act as an advocate or seek error in the record." *U.S. Bank v. Lindsey*, 397 Ill. App. 3d 437, 459 (2009) (quoting *Obert v. Saville*, 253 Ill. App. 3d 677, 687 (1993)).

We will not "research the issues on the appellant's behalf." *Gakuba v. Kurtz*, 2015 IL App (2d) 140252, ¶ 19. Likewise, we will not "formulate an argument for defendant out of whole cloth." *People v. Inman*, 2023 IL App (4th) 230864, ¶ 13. Accordingly, we find the court did not abuse its discretion here either.

¶ 48    Defendant next argues Brooks's testimony was not reliable because he (1) did not remember specifically what he had told Moski, (2) wanted to invoke his fifth amendment privilege, and (3) did not want to provide testimony for or against defendant. We disagree.

¶ 49    Brooks recalled vividly the circumstances surrounding his interview with Moski. Only when the State sought to explore details about what defendant had said to Brooks did he then claim he could not recall. It is abundantly clear from the record Brooks did not want to testify against defendant in this case. The record does not indicate Brooks sought to invoke his fifth amendment privilege. In fact, the trial court explicitly questioned Brooks's counsel about this issue and then determined Brooks was seeking to avoid testifying against defendant by claiming he did not remember what defendant had said to him. Brooks's statements to Moski were recorded, and nothing about Brooks's testimony directly called into question the reliability of those statements. Therefore, we find the court's determination was not an abuse of discretion.

¶ 50    Lastly, defendant argues Moski's testimony did not support the trial court's finding because Moski could not verify Brooks's statements. He also contends Moski did not

verify whether defendant and Brooks stayed in the same pod while at the Rock County jail. The court asked Moski if he had been able to verify any of the information Brooks had given him. Moski stated the information Brooks had provided was what Brooks had "heard" from defendant, which Moski said could not be verified because there were no audio recordings from inside the jail. Moski was able to confirm Buchanan had been killed and that Lamon had been investigated in relation to Buchanan's death. To some degree, Moski was able to verify significant aspects of Brooks's statements. The fact Moski did not verify whether Brooks and defendant had shared a pod at the jail does not necessarily mean the two did not share a pod. Ultimately, the court was tasked with determining the credibility of Moski and Brooks. See *People v. Glover*, 2017 IL App (4th) 160586, ¶ 28 ("The trial court, by virtue of its ability to observe the conduct and demeanor of the witnesses, is in the best position to make credibility determinations."). Nothing in defendant's arguments on appeal undermines the court's findings. That is, we cannot say the court's finding that Brooks's testimony was sufficiently reliable and admissible was arbitrary, unreasonable, or a view that no reasonable person would take.

¶ 51         We also briefly note defendant argues Brooks's testimony at trial further showed why the trial court's determination at the reliability hearing was in error. For example, defendant contends certain aspects of Brooks's trial testimony were inconsistent with his statements to Moski. This would have been an issue of credibility for the jury to decide and not for the trial court, after the fact, regarding the reliability hearing. *Serritella*, 2022 IL App (1st) 2000072, ¶ 138 (The credibility of the testimony of a jailhouse informant is "generally a question for the jury.").

¶ 52                    B. Sufficiency of the Evidence Claim

¶ 53        Defendant contends the evidence was insufficient to convict him of first degree murder.

¶ 54        When examining the sufficiency of the evidence, we must determine " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985). The trier of fact has the responsibility to assess the witnesses' credibility, weigh their testimony, resolve inconsistencies and conflicts in the evidence, and draw reasonable inferences from the evidence. *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006). We will not reverse a criminal conviction based on insufficient evidence unless the evidence is so unreasonable, improbable, or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. *People v. Murray*, 2019 IL 123289, ¶ 19.

¶ 55        For first degree murder, the State had to prove (1) defendant performed the acts which caused the death of Lamon and (2) when he did so, he knew that his acts would create a strong probability of Lamon's death. 720 ILCS 5/9-1(a)(2) (West 2020).

¶ 56        Defendant's arguments are twofold: (1) pursuant to *Neil v. Biggers*, 409 U.S. 188 (1972), Gordon's identification testimony raises reasonable doubt and (2) Gordon's testimony in totality was so inconsistent and incredible that no jury could reasonably accept it. We address each of these claims in turn.

¶ 57        Regarding eyewitness identification, our supreme court has noted a single witness's identification that is vague and doubtful is insufficient to sustain a conviction; however, a single witness's identification is "sufficient to sustain a conviction if the witness viewed the accused under circumstance permitting a positive identification." *People v. Lewis*,

165 Ill. 2d 305, 356 (1995). When assessing the reliability of identification testimony, reviewing courts have relied upon the factors set forth in *Biggers*. The *Biggers* factors include:

> "(1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation." *People v. Piatkowski*, 225 Ill. 2d 551, 567 (2007).

No single factor is dispositive, and the reliability of the identification is based on the totality of the circumstances. *Biggers*, 409 U.S. at 199.

¶ 58 Regarding the first factor, defendant argues it was dark outside. Regarding the second factor, defendant argues Gordon never testified to his degree of attention but only that he drove around and talked with defendant. Regarding the third factor, defendant argues Gordon testified he had seen defendant "around" prior to the incident and knew him as "Little D." Defendant notes there was no testimony by anyone else that he went by the nickname "Little D." Regarding the fourth factor, defendant concedes Gordon stated he was "a thousand" percent certain of his identification of defendant during the photo lineup. Regarding the fifth factor, defendant argues it was six days after the incident when Gordon identified defendant in a photo lineup. He argues this was due to Gordon's inconsistent statements after the incident as to what had occurred with his vehicle, as he provided police officers with different stories.

¶ 59 We take a moment here to note defendant's supporting argument in his brief for what he identifies as the issues under the *Biggers* factors appear to reference facts and individuals not pertinent or related to this appeal. As such, we have not considered the same in our analysis. See, *e.g.*, *In re Estate of Jackson*, 354 Ill. App. 3d 616, 620 (2004) (A reviewing

"court will not consider facts recited in an appellant's statement of facts that find no basis in the record.").

¶ 60         Also, before we proceed to our analysis of the *Biggers* factors, we note these factors are contained in Illinois Pattern Jury Instructions, Criminal, No. 3.15 (approved July 28, 2017). These instructions were tendered by the State and, without objection from defendant, given to the jury for its deliberations in this matter.

¶ 61         Regarding the factors themselves, the fact that it may have been dark outside does not itself make Gordon's identification unreliable. The first factor contemplates Gordon's opportunity to view defendant. According to Gordon's testimony, defendant was a mere few feet away in the passenger seat as they drove around until defendant fired his gun at Lamon. Regarding the second factor, defendant does not offer any reason for why Gordon's degree of attention not being addressed in his testimony creates reasonable doubt. Regarding the third factor, defendant contends no one corroborated Gordon's testimony that defendant went by the nickname "Little D." However, this is a credibility issue for the jury and does not, without more, undermine Gordon's identification.

¶ 62         Gordon was extremely confident in his identification of defendant in the photo lineup, which occurred less than a week after the incident. Based on our review of Gordon's testimony, the totality of the circumstances, and the fact that the jury was aware of the *Biggers* factors during its deliberations, we find a rational trier of fact could have found Gordon's identification of defendant sufficient.

¶ 63         Defendant's final contention concerns Gordon's testimony altogether. Defendant contends various aspects of Gordon's testimony were inconsistent and unreliable, such as (1) Gordon's inability to recall specifics about defendant's clothing, (2) Gordon's admission he

used cocaine, (3) Gordon's inability to recall the specifics about when he drove defendant and Lamon, including times, speed limits, and geographic locations, and (4) Gordon's telling Moyer his vehicle had broken down. Defendant also argues various aspects of Gordon's testimony were improbable and, therefore, unreliable such as (1) Gordon's claim he jumped from a moving vehicle when his injuries were not supported by the record or (2) Gordon's apparent belief he was being surveilled by drones.

¶ 64     The bulk of his arguments concern Gordon's credibility. As a court of review, we will not retry defendant or substitute our judgment for that of the jury regarding witness credibility or the weight of the evidence. *People v. Gray*, 2017 IL 120958, ¶ 35. The mere fact that any of Gordon's testimony could be determined as inconsistent or even contradictory will not automatically render Gordon's testimony as so improbable as to warrant reasonable doubt. See *id.* ¶ 47 ("[E]ven contradictory testimony does not necessarily destroy the credibility of a witness, and it is the task of the trier of fact to determine when, if at all," a witness testified truthfully.). Based on our review of Gordon's testimony, it was well within the province of the jury to determine whether he was credible. Certainly Gordon, two years later, struggled with various details from the night of the shooting. However, most of Gordon's recollection failures concerned collateral matters, which would not necessarily "render the testimony of the witness as to the material questions incredible or improbable." *Id.* On the material issues, Gordon was clear about what he heard and saw. He stated he knew of defendant prior to that evening, and he testified to defendant shooting Lamon four or five times, which was closely corroborated by the cartridge cases recovered from the vehicle. Gordon was extremely confident in his identification of defendant as the shooter. Gordon's limping following the shooting was corroborated by multiple witnesses.

¶ 65　　　　A jury was tasked with weighing all the evidence at trial, including all of the testimony, whether consistent or otherwise, and determining whom, if anyone, to find credible. As we noted above, we are not retrying defendant but reviewing the evidence in a light most favorable to the prosecution to determine if *any* rational trier of fact could have found defendant guilty beyond a reasonable doubt. This standard makes it the jury's responsibility to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "[A] reviewing court will not substitute its judgment for that of the trier of fact on issues involving the weight of the evidence or the credibility of the witnesses." *Murray*, 2019 IL 123289, ¶ 19. We find Gordon's testimony was not so unreasonable, improbable, or unsatisfactory that it created a reasonable doubt of defendant's guilt. Therefore, we find a jury could reasonably conclude beyond a reasonable doubt defendant shot Lamon, and when he did so, he knew it created a strong probability of his death.

¶ 66　　　　Lastly, defendant points to various evidentiary issues, such as (1) the bullet entrance wounds to the left side of Lamon appear to contradict Gordon's version of events, (2) Dr. Peters had failed to test hair found in Lamon's hand during the autopsy, (3) there were no cell phone records belonging to defendant utilized to place him in the area at the time of Lamon's shooting, and (4) no blood from inside the vehicle was tested.

¶ 67　　　　Defendant's contentions here are brief and open-ended. It appears defendant believes we should take these evidentiary complaints and run with them until we find reasonable doubt. However, as a court of review, we must determine whether *any* rational trier of fact could have found the essential elements of first degree murder beyond a reasonable doubt, not entertain or try, on appeal, defendant's rhetorical questions. See *People v. Echoles*, 36 Ill. App. 3d 845,

852 (1976) ("As a court of review, we must ascertain whether the factual determination reached by the trier of fact was properly entertained, not whether a different finding could also be supported by the record."). More importantly, the evidence defendant complains of is corroborating evidence, which is not required to prove a defendant's guilt beyond a reasonable doubt. See *In re Z.C.*, 2022 IL App (1st) 211399, ¶ 51 (citing *People v. Sargent*, 239 Ill. 2d 166, 183 (2010)) ("In the criminal context, there is no requirement that corroborating evidence prove commission of an offense beyond a reasonable doubt."). Accordingly, we remain unpersuaded by defendant's arguments on appeal.

¶ 68                                III. CONCLUSION

¶ 69          For the reasons stated, we affirm the trial court's judgment.

¶ 70          Affirmed.